OPINION
Appellants Buckeye Forest Council, Dysart Defenders, Chad Kister and Ohio University (collectively known as appellants) appeal the decision of the Reclamation Commission (Commission) granting an exemption from a Land Unsuitable Petition (LUP) to appellees Division of Mineral Resources Management, Ohio Valley Coal Company (OVCCO), American Energy Corporation, (AEC) and Consolidated Land Company (CLC) (collectively known as appellees). This court is asked to determine whether the Commission's decision that a coal mine's coal reserve is a substantial legal and financial commitment in a coal mining operation was a decision that was arbitrary, capricious or otherwise inconsistent with law. Under that limited review, the law, and the facts of this case, we cannot find that the decision is arbitrary, capricious or inconsistent with the law. Therefore, the Commission's decision is hereby affirmed.
 FACTS
On January 12, 1998, Buckeye Forest Council, a nonprofit organization formed for the purpose of protecting the biological integrity of Ohio forests and habitats, filed a LUP under R.C. 1513.073(A)(2)(b) requesting an area of land in Belmont County, Ohio, to be named unsuitable for coal mining. R.C. 1513.073 (A)(2)(b) states that an area of land can be named unsuitable for mining, if the mining could damage fragile lands that have important scientific and esthetic values and natural systems.
The area of land appellants sought to be named unsuitable included the town of Bethesda, Ohio, Dysart Woods and the surrounding area of land. Dysart Woods is owned by Ohio University and contains trees ranging from three to four hundred years old; it is one of the last remaining old growth forests. Appellants fear that if mining is allowed in the Dysart Woods area, the side effects of mining are going to have a devastating impact on the old trees. Appellants claim that regardless of what type of mining occurs, whether it is long wall mining or room and pillar mining,[1] the settling surface area may have an effect on the water level and the trees.
OVCCO, AEC and CLC, who now own the right to mine this area of land, oppose the LUP. Under the area of land sought to be named unsuitable, runs a section of the Pittsburgh No. 8 coal seam, which has an abundance of coal. OVCCO, AEC and CLC claim they are exempt from the status of unsuitability by R.C. 1513.073 (A)(5). R.C. 1513.073 exempts land that is otherwise unsuitable for mining if a coal mining operation was already being conducted on the land on August 3, 1977, or under a permit for coal mining, or where substantial legal and financial commitments in a coal mining operation were in existence prior to January 4, 1977. R.C.1513.073(A)(5).
To fall under these exemptions, what was occurring on this land prior to 1977 must be considered. In the late 1960s early 1970s, two mining systems existed in this area of land. One mining system was the Allison Mine and the other mining system was the Powhatan No. 6 Mine. Through buying, selling, and land swapping, in 1977 the western part of this area was the Allison Mine and the eastern part was Powhatan No. 6 Mine. In the 1970s, both of these mines were actively mining coal. In 1977, both mines had a coal contract with Cleveland Electric Illuminating Company (CEI). The actual mining that had occurred in Allison Mine was 5.7 miles from Dysart Woods. Powhatan's No. 6 Mine actual mining occurred 4.5 miles from Dysart Woods. However, the rest of land that was not mined was dedicated to its respective mine. Through the change in the coal market over the past two decades these mines were sold. OVCCO, AEC and CLC now own the rights to mine the Powhatan No. 6 Mine, Allison Mine and the mine reserves for those respective mines.
The Chief of the Division of Mines and Reclamation considered these facts and made a ruling in the May 3, 2000 letter to OVCCO. The Chief first made a finding that Dysart Woods was unsuitable for mining. Regardless of this fact, the Chief stated that Pittsburgh No. 8 coal seam was exempt from the unsuitability status. The Chief stated that the Pittsburgh No. 8 coal seam was a part of the original Allison Mine and Powhatan No. 6 Mine. The Chief found that under R.C. 1513.073(A)(5) the LUP area was exempt from the status of unsuitability due to operation prior to August 3, 1977 and the substantial legal and financial commitments (SLFC) expended for this operation were in existence prior to January 4, 1977. Appellants appealed the decision to the Commission. The Commission affirmed the Chief's decision based on the substantial legal and financial commitments (SLFC) that were in effect on January 4, 1977. The Commission declined to determine if the Chief was correct in his determination that the Pittsburgh No. 8 coal seam was located on land which coal mining operation was being conducted on August 3, 1977. Appellants timely appealed the administrative decision.
 STANDARD OF REVIEW
An appellate court reviews the decision of the Board of Commissioners under the limited standard set forth in R.C. 1513.14. Pleasant City v.Ohio Dept. of Natl. Resources, Div. of Reclamation (1993),67 Ohio St.3d 312, 316. A reviewing court will affirm the decision of the Commission unless the court determines that it is "arbitrary, capricious or otherwise inconsistent with law." R.C. 1513.14. If a reviewing court finds that the decision is "arbitrary, capricious or otherwise inconsistent with law," the decision must be vacated and remanded to the Commission for further proceedings consistent with the judgment of the reviewing court. R.C. 1513.14. The arbitrary capricious or inconsistent with law standard of review is a deferential one which presumes that an agency's or board's actions are valid. R.C. 1513.02 (divesting the authority to administer and enforce Chapter 1513 to the division of Mineral Resources Management); Weiss v. PUC (2000), 90 Ohio St.3d 15,17; Cheveron U.S.A., Inc. v. Natural Resources Defense Council Inc. (1984), 467 U.S. 837, 843.
 ASSIGNMENT OF ERROR NO. ONE
Appellants raise four assignments of error. The first of which contends:
 "THE BURDEN OF ESTABLISHING ENTITLEMENT TO A STATUTORY EXEMPTION IS UPON THE ENTITY CLAIMING THE EXEMPTION, AND ANY AMBIGUITY IN THE EXEMPTION STATUTE OR IMPLEMENTING REGULATIONS IS TO BE NARROWLY CONSTRUED AGAINST THE CLAIMANT."
Appellants argue two claims under this assignment of error. First, appellants claim that the Chief and the Commission incorrectly placed the burden of proof upon them to prove the exemption did not apply. Second, appellants state that exemptions must be narrowly construed and both the Chief and the Commission broadly construed the exemptions.
 BURDEN OF PROOF
The general rule is that the party asserting a statutory exception is required to prove the facts warranting application of the exception.State ex rel. Natl. Broadcasting Co. v. Cleveland (1988), 38 Ohio St.3d 79,83 (requiring party asserting exception under public records statute to prove its application); State ex rel. Schaefer v. Montgomery Cty. Bd. ofCommrs. (1967), 11 Ohio App.2d 132, 141 (requiring party asserting exception under public records statute to prove its application); RedHill Farm Trust v. Schregardus (1995), 102 Ohio App.3d 90, 97 (requiring party asserting exception under air pollution statute to prove its application); Pioneer Linen Supply Co. v. Evatt (1946), 146 Ohio St. 248
(requiring party asserting exception under tax statutes to prove its application). The letter from the Chief of his decision shows no indication that he placed the burden upon appellants instead of appellees. The Chief indicated after making his findings of fact that the SLFC exemption was applicable. As such we must presume the Chief applied the right standard of review.
At the commission hearing, Commissioner Menzie stated that the burden of proof was upon appellants. Pursuant to the Rules of the Reclamation Commission enumerated in OAC 1513-3-01 to 1513-3-22, the Commissioner's statement was accurate. OAC 1513-3-16 (B)(3) states that in reviewing orders of the Chief other than those stated in Section (B)(1) or (B)(2), the burden of persuasion rests with appellant. Furthermore, in the Commission's findings, it explained that it was appellants' burden to prove that the Chief's decision was arbitrary, capricious or inconsistent with the law. According to R.C. 1513.13, the Commission reviews the decision of the Chief under the same standard of review that we are required to use. The Commission will affirm the decision of the Chief unless it is arbitrary, capricious or otherwise inconsistent with law. R.C. 1513.13(B). Therefore, the Commission applied the correct standard of review and placed the burden on the correct party. As such, this argument is without merit.
 NARROW CONSTRUCTION V. BROAD CONSTRUCTION
The Ohio Supreme Court has stated that statutes designed to promote the health, safety and welfare of people should be broadly construed. Pizzav. Sunset Fireworks Co., Inc. (1986), 25 Ohio St.3d 1. Regulations on mining are a balance between the contribution mining has on the economy and protecting the environment and people from the harm of mining.30 U.S.C. § 1201, 1202 (the Ohio statute is modeled after the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. § 1201, et seq.). In SMCRA, Congress found that coal mining contributed to the energy requirements of this country. 30 U.S.C. § 1201(b). However, Congress also found that coal mining disturbed the surface area of the land. 30 U.S.C. § 1201(C). In 30 U.S.C. § 1202(b), Congress stated that the purpose for these statutes was to protect the rights of the landowners who had a legal interest in the land and to protect the environment. With these dueling purposes the result is a balancing test.National Wildlife Federation v. Hodel (D.C. Cir. 1988), 839 F.2d 694
reversed on other grounds by National Wildlife Federation v. Lujan (D.C. Cir. 1991), 928 F.2d 453. Therefore, it can be concluded that mining statutes promote the health, safety and welfare of people. As such, the statute is broadly construed and any exceptions to the statute are narrowly construed. The next two assignments of error discuss whether the Chief and the Commission acted arbitrarily, capriciously or inconsistent with the law in its construction of the exemption.
 ASSIGNMENT OF ERROR NO. TWO
Appellants' second assignment of error alleges:
 "FOR THE ACQUISITION OF COAL TO CONSTITUTE A `SUBSTANTIAL LEGAL AND FINANCIAL COMMITMENT IN A COAL MINING OPERATION' UNDER THE STATUTORY EXEMPTION, THE COAL MUST HAVE BEEN ACQUIRED FOR THE PURPOSE OF FULFILLING A LONG-TERM COAL CONTRACT IN EXISTENCE ON OR BEFORE JANUARY 4, 1977."
Areas of land can be named unsuitable for mining if the coal mining operations will affect fragile or historic lands and result in significant damage to important historic, cultural, scientific and esthetic values and natural systems. R.C. 1513.073(A)(2)(b). We agree and give deference to the Chief's decision that Dysart Woods falls under this category. However, land that is otherwise unsuitable for mining can be grandfathered in and permitted to be mined if a coal mining operation was already being conducted on the land on August 3, 1977, or under a permit for coal mining or where SLFC in the operation were in existence prior to January 4, 1977. R.C. 1513.073(A)(5).
The Commission made SLFC findings for both the Allison and Powhatan No. 6 Mines. The phrase "substantial legal and financial commitments in a coal mining operation" is not defined in R.C. Chapter 1513, however, it is defined in the Ohio Administrative Code. OAC 1501:13-1-02(WWWWW)states:
 "`Substantial legal and financial commitments in a coal mining operation' means significant investments that have been made on the basis of a long-term coal contract in power plants, railroads, coal-handling, preparation, extraction or storage facilities and other capital-intensive activities. An example would be an existing mine, not actually producing coal, but in a substantial stage of development prior to production. Costs of acquiring the coal in place or of the right to mine it without an existing mine, as described in the above example, alone are not sufficient to constitute substantial legal and financial commitments."
Therefore, according to the OAC and the Revised Code, the coal reserve must constitute part of a significant investment in Allison Mine and Powhatan No. 6 Mine based on a long term contract that was in existence prior to January 4, 1977, in order for this area of land to be grandfathered in and allowed to be mined. In examining the SLFC status, a mine is examined as it was on January 4, 1977. R.C. 1513.073(A)(5).
While OAC clearly states that the purchase of a reserve without the existence of a mine would not be enough to justify a SLFC finding, no reference is made about a coal reserve for an existing coal mine. No cases have been decided in Ohio determining whether or not the purchase and dedication of a coal reserve to an already producing mine is a SLFC.
 SIGNIFICANT INVESTMENTS
The Commission found that significant investments were made to this area of land. The financial commitments to Powhatan No. 6 Mine exceeded twenty-five million dollars. This amount included the original coal reserves, and costs associated with the infrastructure and equipment of the mine. Regarding Allison Mine, the financial commitments prior to January 4, 1977, exceeded twenty-one million dollars. This amount included cost of buildings, surface land, coal reserves, mine development and equipment.
In addition to the above, in 1969 Allison Mine and Powhatan No. 6 Mine executed a land swap between the two mines whereby the mines traded the right to mine parcels of land between each other. Prior to this land swap, Powhatan No. 6 Mine owned the right to mine under Dysart Woods. However, this section of land was not connected to any land that Powhatan No. 6 Mine had the right to mine at that time. Allison Mine was in a similar situation. Part of the land Allison Mine was authorized to mine was not connected to any other land it was authorized to mine. Instead it was situated in the middle of the land Powhatan No. 6 Mine was authorized to mine. Powhatan No. 6 Mine and Allison Mine swapped the right to mine these parcels of land, thereby creating a continuous mining system.
Prior to the mine swap, as described above, a checkerboard mining system existed in and around Dysart Woods. The easiest way to understand this is to picture a checkerboard with black and red squares. Prior to the coal land exchange, Powhatan No. 6 Mine was the red squares on the checkerboard and Allison Mine was the black squares. When the coal land exchange went through it was as if all the black checkerboard squares were moved to one side of the board and all the red checkerboard squares were moved to the other side. The coal land exchange created a "logical mining system" — a continuous block of land instead of unconnected parcels of land.
The problem with having a checkerboard mining system is that the mines owned by one company would not be connected, therefore making mining more costly. According to the amicus, appellees and the Commission's judgment entry, typically a mine has one entrance through which coal is extracted. If a coal company has checkerboard land, then they would need entrances to mines on every parcel of land. This would make mining more costly.
Therefore, due to the land swap, in 1977 Allison Mine owned the right to mine to the west and under Dysart Woods, and Powhatan No. 6 Mine owned the right to mine to the east of Dysart Woods. Therefore, the land swap could be seen as a substantial financial investment. The land swap allowed both the Allison Mine and Powhatan No. 6 Mine to effectively mine their reserves so that the companies could fulfill coal contracts. Under the limited standard of review, we find that this argument lacks merit; the decision of the Commission is not arbitrary, capricious or inconsistent with the law.
 LONG-TERM CONTRACT
The Commission found that long term coal contracts existed prior to 1977 for this area of land. Both parties were under contract in 1977 to sell coal to Cleveland Electric Illuminating Company (CEI). In regards to Powhatan's No. 6 Mine, a contract was entered into with CEI in 1969. It was for a minimum of 25 years. On January 4, 1977, this 25 year contract was in effect. This contract was extended five years and expired in 1999.
Allison's Mine contract with CEI is not as clear cut as the contract with Powhatan No. 6 Mine. The Allison Mine contract was entered into in 1969. Allison Mine discontinued producing coal in 1981. The record on appeal only contains the first page of this contract and does not state the ending date of the contract. The contract states that CEI will be consuming a great deal of bituminous coal and wants to secure a dependable source for this coal. Affidavits provided from workers of Allison Mine, state that mapping projects were done for future mining. In these mapping projections all of Allison Mining Reserve was included.
The Commission determined that both of these contracts were long term. The Commission's decision is supported by competent evidence, therefore it was not arbitrary, capricious or inconsistent with the law.
However, appellants argue that regardless of whether it was a long term contract, the coal reserves in the LUP area are too remote and were not needed to fulfill the contracts. During the time the CEI contract was being fulfilled, neither Powhatan No. 6 Mine nor Allison Mine extracted coal from the LUP area. Powhatan's No. 6 Mine closest operation to Dysart Woods was 4.5 miles. Allison's Mine closest operation to Dysart Woods was 5.7 miles. The Commission stated that the fact that reserves are located 5-6 miles from the mines' surface facilities is not troubling for those familiar with underground mine plans. In explaining this, it stated that typically coal mines use the same entrance to extract the coal. Machinery does not need to be moved or duplicated at the site of the actual mining. The Commission is the "expert" regarding these claims, therefore we give deference to its findings. R.C. 1513.02 (divesting the authority to administer and enforce Chapter 1513 to the Division of Mineral Resources Management); Weiss, 90 Ohio St.3d at 17; Cheveron,467 U.S. at 843.
Appellants insist that the contracts entered into in 1969 with CEI must state in it that the coal in Allison Mine Reserve and the coal in Powhatan No. 6 Mine Reserve were intended to be used to fulfill the contracts. Appellees and the amicus brief point out that coal reserves are a major thing for coal companies. They insist that companies like CEI will not enter into contracts for coal if the mining company does not have coal reserves. Furthermore, they claim it is an industry wide practice to not include in the contract which area of land the coal is being extracted from to fulfill the contract. Given the fact that the Commission stated that the coal reserves dedicated to Allison Mine and Powhatan No. 6 Mine were part of the SLFC made to those mines on January 4, 1977, we must give deference to that factual finding. As such we cannot state that the determination was arbitrary, capricious or inconsistent with law.
The Commission's findings are supported by the evidence. The amount of money invested in the mine, the effect of the land swap, the distance between the coal mine and the reserves, and the absence of language in the contract that the reserves are needed to fulfill the contract are determinations that this court should give deference to the Commission since it is the "expert." R.C. 1513.02 (divesting the authority to administer and enforce Chapter 1513 to the division of Mineral Resources Management); Weiss, 90 Ohio St.3d at 17; Cheveron, 467 U.S. at 843. Therefore, under the limited standard of review, this assignment of error lacks merit.
 ASSIGNMENT OF ERROR NO. THREE
Appellants' third assignment of error alleges:
 "EVEN IF ACQUISITION OF THE DYSART WOODS COAL WAS A `SIGNIFICANT LEGAL AND FINANCIAL COMMITMENT,' IT SERVES ONLY TO EXEMPT THE `COAL MINING OPERATION' AS OF 1977, AND NOT TO EXEMPT THE DYSART WOODS COAL RESERVES THAT WERE NOT BEING ACTIVELY MINED AT THAT TIME."
Appellants argue that even if this court finds SLFC status, the LUP area cannot be mined because that area of land was not in "operation" in 1977. Appellants' argument is based on the definition of "operation" and the West Virginia case of Cogar v. Faeber (1988), 179 W. Va. 600,371 S.E.2d 321.
In Ohio, "coal mining operation" or "operation" is defined as:
 "(1) Activities conducted on the surface of lands in connection with a coal mine, the removal of coal from coal refuse piles, and surface impacts incident to an underground coal mine. Such activities include excavation for the purpose of obtaining coal, including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining; the use of explosives and blasting; in situ distillation or retorting; leaching or other chemical or physical processing; and the cleaning, concentrating, or other processing or preparation of coal. Such activities also include the loading of coal at or near the mine site.
"* * *
 "(2) The areas upon which such activities occur or where such activities disturb the natural land surface. Such areas include any adjacent land the use of which is incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities, and for hauling, and excavation, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, holes or depressions, repair areas, storage areas, processing areas, shipping areas, and other areas upon which are sited structures, facilities, or other property or materials on the surface, resulting from or incident to such activities. Separation by a stream, roadway, or utility easement does not preclude two or more contiguous tracts of land from being considered contiguous." R.C. 1513.01(H). See, also, OAC 1501-13-1-02(W).
This definition of operation indicates that activities occurring need to produce coal or be incidental to the production of coal. As explained earlier, an existing mine not actually producing coal, but in a substantial stage of development prior to production is a "substantial legal and financial commitment in a coal mining operation." This definition does not require the actual production of coal. These definitions are in conformity with each other; SLFC status is incidental to the production of coal. However, neither definition references a coal reserve as being part of a coal mining operation.
Appellants insist a coal mining operation, in addition to the above definition, means an area covered by permit or in the process of a permit application. In Cogar, the Supreme Court of West Virginia was asked to determine whether a permit to mine could be modified to allow a new entrance to an underground mine. The new entrance would be close to a public road and occupied dwellings, and thereby in violation of the West Virginia Code. Id. The mine operators were looking to be grandfathered in by W. Va. Code 22-3-22(d). W. Va. 22-3-22 is almost identical to R.C.1513.073. W. Va. 22-3-22(d) states that after August 3, 1977 and subject to valid existing rights, no surface-mining operations, except those which existed on that date, shall be permitted. The statute then goes through a list of lands which are grandfathered in to mine. Mine operators claimed that this section allowed them to open the new mine entrance in a previously unmined area where they would not otherwise be allowed to open an entrance. They claimed this area of land is part of a tract of land that had been mined as of August 3, 1977.
The Supreme Court of West Virginia stated that, "A person possessesvalid existing rights if he can demonstrate that the coal is immediately adjacent to an ongoing mining operation which existed on August 3, 1977 and is needed to make the operation as whole economically viable." Id. citing W. Va. C.S.R. 38-2-2.119 (1983) (emphasis added). The Supreme Court of West Virginia held that in the context of valid existing rights, mining operations include only areas covered by a permit or permit application. Cogar, 371 S.E.2d 321, 324. The mining operators then alternatively argued that where SLFC in the operation existed prior to January 4, 1977, would allow them to mine that area. The Court stated that the mining operators failed to show more than mere ownership, which is not enough to constitute SLFC. Id. Furthermore, the court found that SLFC only applied to a finding of unsuitability, not to valid existing rights. Id.
Cogar is distinguishable from the case at hand. The West Virginia Court stated that in the context of valid existing rights, operation means that portion of land under permit. In the subsection that is applicable to the case at hand, valid existing rights are not the issue; SLFC in a coal mining operation under R.C. 1513.073(A)(5) is the issue. Valid existing rights are not referenced in R.C. 1513.073(A)(5). If the Cogar definition of a coal mining operation is inserted in place of the words "coal mining operation" in R.C. 1513.073(A)(5) the reading of that section is repetitive and does not give meaning to the legislature's use of both "permit" and "coal mining operations." R.C. 1513.073(A)(5) would state that the requirements of Section A do not apply to lands that are already covered by permit [Cogar definition replaced the phrase coal mining operation] on August 3, 1977 or under permit issued under this chapter or where SLFC in the area under permit [Cogar definition replaced the phrase coal mining operation] were in existence prior to January 4, 1977. The use of the Cogar definition gives no meaning to the legislature's choice to use both "coal mining operation" and "under a permit" as choices for falling within the August 3, 1977 exemption. Therefore, coal mining operation must mean something other than under permit.
Furthermore, the case at hand involves the subsection of the statute dealing with the SLFC in a coal mining operation. Therefore, that specific definition should apply. Since the coal mine already existed and was in a substantial stage of development, the coal reserves could fall within the definition of operation under the OAC. The Commission's judgment emphasized how important coal reserves are to a coal mining operation in acquiring and fulfilling a coal contract. As such, we give deference to the expertise of the Commission in this area. R.C. 1513.02
(divesting the authority to administer and enforce Chapter 1513 to the division of Mineral Resources Management); Weiss, 90 Ohio St.3d at 17;Cheveron, 467 U.S. at 843. As such this assignment of error is without merit.
 ASSIGNMENT OF ERROR NO. FOUR
Appellants' fourth assignment of error alleges:
 "THE COMMISSION'S BROAD EXEMPTION OF PASSIVE COAL RESERVES VITIATES THE LEGISLATIVE PURPOSE UNDERLYING THE AREA UNSUITABILITY PROCESS OF PROTECTING FRAGILE LAND AND UNIQUE NATURAL AREAS."
In the absence of any ambiguity in the language of the statute, there is no need to consider the legislature's intent in enacting the statute.In re M.B. (June 29, 2000), 10th Dist. No. 99AP-922. A court only has the right to interpret a statute when the words of the statute are ambiguous, uncertain in meaning or conflicting. Id.; State ex rel.Burrows v. Industrial Comm. (1997), 78 Ohio St.3d 78, 81; In re Collier
(1993), 85 Ohio App.3d 232, 237 (stating "Under Ohio law, it is a cardinal rule that a court must first look to the language of the statute itself to determine the legislative intent"). Appellants do not specify what the ambiguity is in this statute that allows this court to even consider the legislative purpose.
R.C. 1513.073 states, in pertinent part:
 "(A)(1) Upon petition pursuant to division (B) of this section, the chief of the division of mineral resources management shall designate an area as unsuitable for all or certain types of coal mining operation if the chief determines that reclamation pursuant to the requirements of this chapter is not technologically and economically feasible.
 "(2) Upon petition pursuant to division (B) of this section, a surface area may be designated unsuitable for all or certain types of coal mining operation if the operations will:
 "(b) affect fragile or historic lands in which the operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems:
 "(5) The requirements of this section do not apply to lands on which coal mining operation were being conducted on August 3, 1977, or under permit issued pursuant to this chapter or where substantial legal financial commitments in the operation were in existence prior to January 4, 1977."
The language of this statute is not ambiguous. As such, this assignment of error is without merit.
For the foregoing reasons, the decision of the Reclamation Commission is hereby affirmed. In so doing, we note that our decision does not per se authorize mining to occur under or around Dysart Woods. In order for mining to occur in this area, appellees must seek and be granted a permit under R.C. 1513.07 and R.C. 1513.071. Under these statutes numerous considerations are examined, including the hydrologic consequences and objections from parties having an interest and who would be adversely affected by the granting of the permit. Accordingly, it is likely that the matter may be back before this court in the event such a permit is requested and either granted, or denied.
Donofrio, J., and Waite, J., concur.
[1] In longwall mining a whole section of coal is taken from an area. In that underground section after the coal is extracted there are no pillars left to hold up that empty section. The surface area of this land subsides filling in the empty section of earth left from the coal extraction. This causes the flow of the ground water to change. Room and pillar mining is different from longwall mining. Room and pillar mining leaves pillars in these areas and does not cause as much settling of the surface area as occurs with longwall mining. Room and pillar mining extracts only about 50% of the coal.