OPINION
{¶ 1} Appellants Karl and Brenda Spires appeal from the decision of the Reclamation Commission which upheld the decision of the Chief of the Division of Mineral Resources Management approving a mining permit sought by appellee Oxford Mining Company, Inc. The issue on appeal is whether the Commission's decision was arbitrary, capricious or otherwise inconsistent with law. Specifically, appellants established that the pond they wish to protect from the risk of dewatering was originally watered when a prior mining operation blasted into an unmapped, inundated underground mine. From this undisputed fact, appellants contend that anticipated mining in the same area and reliance upon an inaccurate map creates a substantial *Page 3 
risk that the pond in question will be dewatered. For the following reasons, the Commission's decision is affirmed.
 STATEMENT OF THE CASE {¶ 2} Oxford Mining applied to the Ohio Department of Natural Resources, Division of Mineral Resources Management (ODNR, DMRD) for a mining permit over five hundred seventy-six acres of land outside of Flushing, Ohio whereupon extensive deep mining and strip mining had occurred over the past century. Oxford declared an intent to strip mine two hundred twenty-seven acres of Meigs #9 coal and a three-acre island of Waynesburg #11 coal, and to auger mine an additional one hundred eleven acres.
 {¶ 3} The Spires live on fourteen acres adjacent to the proposed mining site that they purchased in 1990. On this property is 68% of a pond that borders the mining site, with their two neighbors owning the remainder of the pond. This pond was previously a strip mining pit that immediately filled with water in 1972 when a mining company set off its charges and inadvertently breached an abandoned and inundated deep underground mine that was not properly mapped.
 {¶ 4} Most of Oxford's proposed strip mining was more than nine hundred feet away from the pond, but the aforementioned three acre site was within four hundred fifty feet. Most of the auger mining was more than six hundred feet from the pond, but some was within one hundred feet. In support of their permit application, Oxford submitted information from an underground deep mine map produced in 1926 and archived in the National Map Repository. This map failed to show the deep mine that created the pond (or failed to show the actual extent of the closest mapped deep mine).
 {¶ 5} Due to the desire to mine within five hundred feet of the mapped deep mine, Oxford was required to submit a mine avoidance plan. See R.C.1513.16 (A)(12). The plan called for test drilling to begin when mining approached within one hundred fifty feet of a mapped mine. This entailed establishment of the borders of the abandoned mine and the creation of a fifty-foot barrier between it and the new mining.
 {¶ 6} Due to the history of the pond's creation and Oxford's reliance on a map proven to be inaccurate, the Spires objected to the granting of the permit due to their fear of their pond being dewatered. On August 31, 2004, the Chief of the ODNR, *Page 4 
DMRM held an informal conference with Oxford and the Spires. See R.C. 1512.071(B).
 {¶ 7} On October 4, 2004, the Chief released written findings approving the permit and declaring that the Spires' concern about their pond dewatering was unfounded. The Chief detailed the course of various waterways, found that the source of the pond's recharging would not be affected and stated that it was highly unlikely that the pond would be adversely impacted. The Chief noted that if the pond was adversely affected, Oxford was statutorily responsible to remedy any dewatering. See R.C. 1513.162(A).
 {¶ 8} The Spires appealed to the Reclamation Commission pursuant to R.C. 1513.13(A)(1). See, also, R.C. 1513.07(I)(3). Oxford Mining was permitted to intervene in that appeal to argue their position. An evidentiary hearing commenced before the Commission on August 2, 2006.
 {¶ 9} Mr. Spires testified as to the history of the pond and his investigative efforts. He stated that an intermittent stream fed the pond but explained that even in dry weather, the pond continues to fill suggesting that underground water seeping from the old mine still feeds the pond. (Tr. 67, 78-79). He expressed his concern that the test drilling is inadequate since it does not apply until the mining approaches within one hundred fifty feet of a mapped mine. He pointed out that the 1972 incident that created his pond was three hundred feet from a mapped mine. (Tr. 55-56). He also stated that the pond is uphill from the proposed mining and the depths thereof, which tends to show more risk of dewatering. (Tr. 44, 54).
 {¶ 10} The Spires then called the employee in charge of drilling and blasting for the mining company that inadvertently created the pond in 1972. He disclosed that the blast holes were drilled forty-five feet down. (Tr. 90). He revealed that all twelve holes in a thirty by forty foot area filled with water, but still, he ignited the explosives at his foreman's instruction. (Tr. 95-97). He testified that after the blast, he heard hissing, saw water and then watched the ground burst open and explode with water which quickly filled the strip mining pit. (Tr. 89, 103-104).
 {¶ 11} Next, the Spires called a licensed surveyor who concluded that the 1926 map upon which Oxford relies is at least three hundred feet off if the mine breached in 1972 is an extension of the closest mine on the map. (Tr. 121, 141). He also noted that the point of breach was not necessarily the tip of the mine. (Tr. 132). He *Page 5 
concurred in Mr. Spires' concern that Oxford's drilling sequence within one hundred fifty feet of the mapped mine could possibly result in a mine breach before any test drilling starts. (Tr. 135-136). He also confirmed that it appeared the coal to be removed was below the elevation of the pond. (Tr. 156).
 {¶ 12} In opposition, an environmental specialist from the ODNR, DMRM testified about the hydrologic impact assessment, the drilling plan, the blasting plan and how the relevant federal agency concurred with the propriety of the plan. (Tr. 165-172). He admitted that small, unmapped punch mines would be mined through. (Tr. 188).
 {¶ 13} Then, a mining engineer from the ODNR, DMRM opined that the test drilling plan was adequate. (Tr. 218). He noted the sealing plans in the event of a breach and outlined how the pond could be restored in the event of dewatering, which occurrence he described as unlikely. (Tr. 219, 224-225, 242). He explained that Oxford was drilling south to north in the direction of the mine in question and the Spires' pond, which would further assist in detecting mine borders. (Tr. 220). He pointed out that the maps on file in the map repository are not always the final product and are not perfect. (Tr. 237).
 {¶ 14} Next to testify was a registered surveyor with experience in coal mining surveys and permit applications. He explained that the only map available of the area was the one used in the permit application. (Tr. 255). He agreed that it appears there was additional unmapped mining in the area and assumed that the unmapped mine was an extension of the mapped mine. (Tr. 261).
 {¶ 15} Finally, Oxford's mining engineer testified. He opined that the inaccuracy in the map was somewhat less than the three hundred feet estimated by the Spires' surveyor, who had no mining experience. (Tr. 274). He advised that although the test drilling must begin at least one hundred fifty feet from the mapped mines, Oxford would use its discretion to drill even earlier if they believe it is prudent. (Tr. 276-277). He pointed out that Oxford had a high incentive to avoid mine interception, which could result in a loss of lives, money and equipment. (Tr. 276). He also revealed that they may not even get close to the subject mine if the overburden is too high. (Tr. 279). Additionally, the surface on the ridge nearest the pond will not be disturbed. (Tr. 289-290). His overall testimony regarding whether the pond was at a higher or lower elevation than the coal was non-conclusive. (Tr. 284-285, 290). *Page 6 
 {¶ 16} In closing, the Spires asked that the permit be denied in its present form or that a modification be made to expand the test drilling parameters to within five hundred feet of a mapped underground mine to cover the inaccuracies in the maps. (Tr. 297).
 {¶ 17} On October 5, 2006, the Commission released its decision upholding the Chiefs decision to approve Oxford's permit. The Commission's findings of fact and discussion section were thorough. The Commission found that the 1926 map shows an underground mine two to three hundred feet from the pond but agreed that a mine was breached near the pond in 1972. The Commission stated that only a small three acre ridge was being stripped in the northeast corner near the pond and that the remainder of that corner was only being auger mined; however, they recognized that the permit covered the entire parcel of land regardless of Oxford's current intent.
 {¶ 18} The Commission concluded that the mine avoidance plan was an adequate safeguard against unanticipated mine intrusion, noting the test drilling plan, the blasting program and the direction of movement across the land. The Commission stated that the map used by Oxford constituted the best information available and opined that a single anomaly does not throw the whole map into question. The Commission discussed how the breached mine may have been part of the closest mapped mine or may not have been as it may have been a separate mine. The Commission also opined that even if Oxford were to intercept an inundated deep mine, it is likely the pond would not be dewatered or that the dewatering would be temporary.
 {¶ 19} The Commission concluded that the Chief's decision to approve the permit should stand and that the Chief's decision was not arbitrary, capricious or inconsistent with law. See R.C. 1513.13(B) (setting forth the Commission's standard of review). The Spires filed timely notice of appeal directly to this court, which has exclusive jurisdiction to hear such appeal under R.C. 1513.14(A). See, also, R.C. 1513.07(I)(4).
 ASSIGNMENT OF ERROR {¶ 20} The Spires' sole assignment of error provides:
 {¶ 21} "THE RECLAMATION COMMISSION ABUSED ITS DISCRETION BY GRANTING THE PERMIT APPLICATION OF OXFORD MINING IN THIS MATTER."
 {¶ 22} The Spires begin by pointing out that they established that the deep mine map submitted by Oxford was inaccurate. That is, in 1972, a prior mining company *Page 7 
breached an unmapped mine and flooded the strip mining pit thus creating the pond in question. The Spires first urge that if the map is inaccurate at the prior mining site by the pond, then it is likely to be inaccurate elsewhere as well. Next, they claim that proposed test drilling one hundred fifty feet in advance of mining will provide little assistance in avoiding unmapped deep mines because mining may hit an old mine before test drilling even begins. In support, they point to their expert's testimony that the location of the 1972 breach establishes that the map of the closest known mine may be three hundred feet off in portraying mine boundaries.
 {¶ 23} The Spires are also alarmed by auger mining within one hundred feet of the pond and the mining through of "small punch mines." They point out that Oxford's claim that it has no present intent to strip mine the northwest corner closest to the pond is irrelevant because such corner is still covered by the permit and they may develop such intent in the future. See R.C. 1513.01 (L) (defining permit area).
 {¶ 24} The Spires also complain that the Commission speculated that the breach in 1972 could have been of a different mine from the closest mapped mine. Finally, they criticize the portion of the Commission's decision that makes it sound as though the Chief was unaware of the 1972 incident when in fact the Spires had previously presented their evidence on the matter to the Chief and to Oxford. They conclude that the Commission's decision is arbitrary, capricious and/or otherwise inconsistent with law.
 {¶ 25} The ODNR, DMRM responds that the mine avoidance plan submitted by Oxford under R.C. 1513.16 and its intent to mine within five hundred feet of a deep mine is adequate to protect against interception of deep mines in the area. Specifically, Oxford will commence patterned test drilling when mining approaches within one hundred fifty feet of a deep mine; they will implement a fifty foot barrier between new mining and the test-scoped deep mine; they will commence a secondary drilling program associated with blasting; and, they will mine south to north.
 {¶ 26} The DMRM reasons that it is within Oxford's best interests to avoid an inundated deep mine. They note that if such mine is breached, Oxford has the statutory responsibility to ameliorate or repair the interception or potential dewatering. Oxford also has the expertise to perform these duties. The DMRM points out that resource recovery is an important objective and that a secondary goal will also be accomplished in that this previously unreclaimed land will now be reclaimed which will *Page 8 
improve water quality. They conclude that Oxford's application met the statutory conditions so that the decision to approve the permit is not arbitrary, capricious or inconsistent with law.
 {¶ 27} Besides reiterating some of the points outlined by the DMRM, Oxford's brief posits that the partial inaccuracy of the most updated map available does not preclude the granting of a permit. They point out that the statutory requirement is merely to provide the location and extent of "known" mines. See R.C. 1513.07 (B)(2)(n)(i). They advise that the maps of abandoned deep mines are sometimes inaccurate or even nonexistent and state that this does not mean test drilling must occur throughout a mining site to ensure accuracy of the maps. Oxford also contends that it is only speculation that interception of a deep mine would adversely affect their pond. They conclude that they fulfilled all of the statutory requirements for obtaining a permit.
 {¶ 28} Before proceeding to address the arguments set forth above, we begin by disposing of two of the arguments set forth in appellant's reply brief due to their procedural defects. The Commission is usually a seven member board, but only five members presided over this administrative appeal due to recusal. The reply brief submitted by the Spires complains that this is unfair. At the same time, the Spires complain that they had to convince four out of the five presiding members of the Reclamation Commission in order to prevail on their appeal rather than a mere majority. Notably, if the full seven-member Commission was present, they would have had to convince four members as well.
 {¶ 29} In any event, the Spires fail to cite to any part of the record that factually establishes prejudice. See App.R. 16(A)(6). As they concede, the vote could very well have been unanimous here. Additionally, the Spires fail to provide citations to legal authority to support this argument. See App.R. 16(A)(7). The failure to properly cite to the record or to argue an issue separately is grounds for disregarding an argument. App.R. 12(A)(2). Furthermore, these objections were not presented to the Commission below, which constitutes waiver for purposes of appeal. ETB Corp. v. Ohio Liq. Control Comm., 10th Dist. No. 02AP-738, 2003-Ohio-589, ¶ 22, 24. See, also, State v. Underwood (1983),3 Ohio St.3d 12, 13.
 {¶ 30} Moreover, these arguments are not covered in the original appellate brief and are not responsive to the position of either appellee. A reply brief is not the place *Page 9 
for raising new arguments. Rather, it is merely a forum for replying to appellee's brief. App.R. 16(C). Thus, we typically refuse to address on appeal any issues that are raised for the first time in a reply brief, especially in a non-criminal case. Julian v. Creekside Health Ctr., 7th Dist. No. 03MA21, 2004-Ohio-3197, appeal not allowed103 Ohio St.3d 1494, 2004-Ohio-5605. (We also note that the reply brief is in violation of App.R. 19(A), which requires double-spacing.) For all of these reasons, this issue is overruled.
 {¶ 31} The reply brief also presents for the first time a claim that federal law prohibits mining within five hundred feet of an old underground mine. The Spires cite a federal law that provides that state mining law cannot conflict with federal law or be less stringent than federal law. However, they fail to cite the purported federal law that absolutely prohibits such mining. See App.R. 16(A)(7). In fact, they later state that federal law does permit such mining if adequate protections are established. Additionally, the Commission specifically found that the mine avoidance plan was approved by the federal government.
 {¶ 32} In any case, the failure to fully argue this issue and provide required citations is grounds for disregarding it. App.R. 12(A)(2). Furthermore, this argument was not raised at the appropriate time, and a reply brief is not the forum for new arguments or arguments unresponsive to any claim of the appellee. See Julian, 7th Dist. No. 03MA21. See, also, App.R. 16(C). Hence, this issue is overruled. We now proceed to address the validly raised arguments.
 STANDARD OF REVIEW {¶ 33} The court of appeals shall confine its review to the record certified by the Commission. R.C. 1513.14(A). In conducting that review, the court of appeals shall affirm the Commission's decision unless the court determines that it is arbitrary, capricious or otherwise inconsistent with law in which case it shall vacate the decision and remand for further proceedings as it may direct. R.C. 1513.14(A)(3). As such, this court's standard of review from the decision of the Reclamation Commission is "limited". Pleasant City v. ODNR, Div. ofReclamation (1993), 67 Ohio St.3d 312, 316; Buckeye Forest Council v.Division of Min. Res. Mgmt., 7th Dist. No. 01BA18, 2002-Ohio-3010, ¶ 7.
 {¶ 34} In such cases, a reviewing court begins with the presumption that the Commission's action was valid. C.T. Evangelinos v. Division ofMin. Res. Mgmt., 7th *Page 10 
Dist. No. 03BE70, 2004-Ohio-7061, ¶ 18; Buckeye Forest, 7th Dist. No. 01BA18 at ¶ 7, 16. We recognize that the legislature has delegated certain authority to the Commission and that the Commission has accumulated substantial expertise. Buckeye Forest, 7th Dist. No. 01BA18 at ¶ 29, 31, 43, citing R.C. 1513.02. See, also, Tri-State Reclamation,LLC v. Division of Mines and Min. Res. Mgmt., 5th Dist. No. 04CA19,2005-Ohio-6439 (deferring to agency interpretation of statutes). Thus, deference must be given to the expertise of the Commission in determining whether the mining application should be approved. SeePleasant City, 67 Ohio St.3d at 320.
 {¶ 35} We also note that the Commission was best able to view the witnesses and determine the credibility of the statements made by each. See, Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80. On this topic, judgments supported by some competent, credible evidence will not be reversed as being against the manifest weight of the evidence. See CE. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 280. See, also, Buckeye Forest, 7th Dist. No. 01BA18 at ¶ 28 (applying such review to a Commission decision in determining whether it was otherwise inconsistent with law).
 COAL SURFACE MINING LAWS {¶ 36} "`Strip mining' means those coal mining and reclamation operations incident to the extraction of coal from the earth by removing the materials over a coal seam, before recovering the coal, by auger coal mining, or by recovery of coal from a deposit that is not in its original geologic location." R.C. 1513.01(S). The ODNR's Division of Mineral Resources Management (DMRM) is entrusted with the authority to administer, enforce, and implement the Coal Surface Mining Laws contained in Chapter 1513 of the Ohio Revised Code with its Chief as the decision-maker. R.C. 1513.02(A).
 {¶ 37} An operator cannot conduct a coal mining operation without a permit issued by the Chief of the DMRM. R.C. 1513.07(A)(1). The permit application shall contain various items as contained in R.C.1513.07(B)(2). For instance, the applicant must provide a statement of the quality and locations of subsurface water. R.C.1513.07(B)(2)(n)(ii). In fact, there must be a determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, so that the Chief can make an assessment of the probable cumulative impacts upon *Page 11 
the hydrology of the area and particularly upon water availability. R.C.1513.07 (B)(2)(k).
 {¶ 38} Moreover, there shall be submitted "[a]n accurate map or plan, to an appropriate scale, clearly showing the land to be affected and the land upon which the applicant has the legal right to [mine] * * *." R.C.1513.07(B)(2)(i). The applicant must submit "[a]ccurate maps prepared by or under the direction of and certified by a qualified registered professional engineer, registered surveyor, or licensed landscape architect to an appropriate scale clearly showing all types of information set forth on topographical maps * * * [and] all boundaries of the land to be affected, the boundary lines and names of present owners of record of all surface areas abutting the permit area * * *." R.C. 1513.07(B)(2)(m). The following further maps are required:
 {¶ 39} "Cross-section maps or plans of the land to be affectedincluding the actual area to be mined, prepared by or under the direction of and certified by a qualified registered professional engineer or certified professional geologist with assistance from experts in related fields such as hydrology, hydrogeology, geology, and landscape architecture, showing pertinent elevations and locations of test borings or core samplings and depicting the followinginformation: the nature and depth of the various strata of overburden; the nature and thickness of any coal or rider seam above the coal seam to be mined; the nature of the stratum immediately beneath the coal seam to be mined; all mineral crop lines and the strike and dip of the coal to be mined within the area to be affected; existing or previous coalmining limits; the location and extent of known workings of anyunderground mines, including mine openings to the surface; the location of spoil, waste, or refuse areas and topsoil preservation areas; the location of all impoundments for waste or erosion control; any settling or water treatment facility; constructed or natural drainways and the location of any discharges to any surface body of water on the land to be affected or adjacent thereto; profiles at appropriate cross sections of the anticipated final surface configuration that will be achieved pursuant to the operator's proposed reclamation plan; the location of subsurface water, if encountered; the location and quality of aquifers; and the estimated elevation of the water table." R.C.1513.07(B)(2)(n)(i) (emphasis added).
 {¶ 40} As to performance standards, the operator must minimize the disturbances to the prevailing hydrological balance. R.C.1513.16(A)(10). Additionally, the operator must conduct augering operations associated with strip mining in a *Page 12 
manner to maximize recoverability of the reserves and then seal the auger holes. R.C. 1513.16(A)(9). The Chief may prohibit augering if necessary to protect against adverse water quality impacts. Id. Furthermore, a satisfactory reclamation plan must be submitted which provides certain details. R.C. 1513.07(C).
 {¶ 41} Moreover, the applicant for a coal mining and reclamation permit shall submit a blasting plan to the Chief that describes the procedures and standards for compliance with the law. R.C.1513.07(B)(7). See, also, R.C. 1513.161. The operator must refrain from coal mining within five hundred feet of abandoned underground mines in order to prevent breakthroughs. R.C. 1513.16(A)(12). However, the Chief shall permit the operator to mine near, through or partly through an abandoned mine if two conditions are both satisfied. Id. First, the Chief must approve the nature, timing and sequencing of the approximate coincidence of specific strip mining activities with specific underground mine activities. R.C. 1513.16(A)(12)(a). Second, the operation must result in improved resource recovery, abatement of water pollution, or elimination of hazards to the health and safety of the public. R.C. 1513.16(A)(12)(b). See, also, R.C. 1513.07(E)(7) (regarding previous water pollution).
 {¶ 42} In seeking a permit, the applicant has the burden to establish compliance with all procedural and substantive permit requirements. R.C.1513.07(E)(1). The Chief of DMRM then makes the decision to approve, require modification of or deny the permit. Id. The permit cannot be approved unless the application affirmatively establishes and the Chief finds in writing that the application is accurate and complete and all the requirements of Chapter 1513 have been met. R.C. 1512.07(E)(2)(a). Moreover, the Chief must have made an assessment of the probable cumulative impact of all anticipated mining in the general and adjacent area on the hydrologic balance specified in division (B)(2)(k) and that the proposed operation has been designed to prevent material damage to hydrologic balance outside the permit area. R.C. 1513.07(E)(2)(c)(i).
 {¶ 43} Upon appeal of the Chiefs decision, the Commission shall affirm unless it determines that the decision is arbitrary, capricious or otherwise inconsistent with law. R.C. 1513.13(B). As aforestated, this is the same standard that this court applies in reviewing the decision of the Commission. R.C. 1513.14(A). The burden in the appeal to the Commission shifts to the one appealing the grant of the permit.Buckeye Forest, 7th Dist. No. 01BA18 at ¶ 12. *Page 13 
 ANALYSIS {¶ 44} We first address the Spires' statement that the Chief of DMRM failed to note in his decision that they advised him of the 1972 incident that created their pond when a previous mining operation in the same area intercepted an inundated deep mine three hundred feet from any mapped mine. We respond by pointing out that such fact does not change the result here as we are reviewing the Commission's decision.
 {¶ 45} The Commission issued a thorough written decision, which fully explained how the incident did not require denial of Oxford's permit. The Commission upheld the Chief's decision to approve the permit. The fact that their decision did not use all the same reasons expressed by the Chief but contained additional factual background and rationale does not affect our review. The Commission specifically acknowledged the 1972 incident and its implications. The Commission even noted that the Chief's decision did not mention the 1972 incident in the findings and conclusions. The fact that the Spires presented the same facts about the genesis of the pond to the Chief does not change the outcome of the Commission's decision, which is being reviewed here.
 {¶ 46} In any case, we note that the Reclamation Commission hearing an appeal is not limited to a review of the record as this court is so limited. See R.C. 1513.13(B); 1513.131; 1513.14(A). The Commission held a hearing and made a decision based upon the evidence it heard. The Spires did not object to the Commission's hearing evidence at the time; nor do they object to it now. In the form argued by the Spires, this argument is superfluous to and non-dispositive of the crux of the matter before us.
 {¶ 47} Contrary to the Spires' next complaint on appeal, the Commission did not find that the mine that created their pond was not part of the nearest mapped mine. Rather, they noted that it couldeither be part of the nearest mapped mine or it could be another mine. Merely because no direct evidence was presented on whether there could be another mine around the area does not mean the Commission cannot make such a statement. The Commission knows more about mines, both mapped and unmapped, than either the Spires or this court. The deference to accord the Commission's findings and determinations is discussed further infra. *Page 14 
 {¶ 48} As to the Spires' complaint regarding the sufficiency of the test drilling plan, the DMRM states that the only two statutory requirements for allowing mining closer than five hundred feet of a deep mine were sufficiently satisfied here. That is, there must first be approval of "[t]he nature, timing, and sequencing of the approximate coincidence of specific strip mine activities with specific underground mine activities * * *." R.C. 1513.16(A)(12)(a). It is pointed out that there are not activities occurring in the abandoned mine which must be timed or coincided.
 {¶ 49} As to the second requirement, the Chief and the Commission found that "[t]he operations will result in improved resource recovery, abatement of water pollution, or elimination of hazards to the health and safety of the public." R.C. 1513.16(A)(12)(b). In fact, when these two conditions exist, the Chief "shall permit an operator to mine near, through, or partially through an abandoned underground mine * * *." R.C.1513.16(A)(12) (emphasis added).
 {¶ 50} Oxford maintains that its permit application was not lacking in any category. However, the Spires' arguments can be seen as contesting the adequacy of the permit due to the inaccuracy of the deep mine map, the nature of the mining closer than five hundred feet of an abandoned mine (which could fall to the first condition for mining close to deep mines in R.C. 1513.16(A)(12)(a) set forth above), and the opinion formed on to the hydrological consequences.
 {¶ 51} Notably, when describing the required maps of the land, topography and boundaries, two divisions in the statute modify map with "accurate." See R.C. 1513.07(B)(2)(i) and (m). However, the division concerning the map at issue here does not modify map with "accurate." See R.C. 1513.07(B)(2)(n)(i). Rather, it merely states that there shall be submitted: "Cross-section maps or plans of the land to be affected including the actual area to be mined * * * depicting * * * existing or previous coal mining limits; the location and extent of known workings of any underground mines, including mine openings to the surface * * *." Also important to note here, is the use of the word "known" before underground mines.
 {¶ 52} These differences in the statutory modifiers work in Oxford's favor. In other words, the absolute accuracy of underground mine maps is not a requirement for finding a permit application sufficient. As the Commission found, deep mine maps are never guaranteed to be accurate, and at times, they do not even exist for a certain parcel. The Commission possesses great expertise on these matters and such *Page 15 
expertise must be deferred to in evaluating the evidence on mapping. SeePleasant City, 67 Ohio St.3d at 320; C.T. Evangelinos, 7th Dist. No. 03BE70 at ¶ 18; Buckeye Forest, 7th Dist. No. 01BA18 at ¶ 7, 16, 29, 31, 43.
 {¶ 53} Moreover, the Commission's expertise must be respected in evaluating the risk to the Spires' pond. As the Commission noted, patterned test drilling, secondary drilling and blasting were all to begin at the farthest point from the Spires' pond. This will further increase the accuracy of Oxford's boundary-gathering. If a mine is suspected in the testing, mining will be suspended for further investigation and active avoidance can be employed if necessary. As noted by the Commission, the pond is partially fed by surface water. The Commission determined that risk of catastrophic dewatering was low even if the underground mine was breached.
 {¶ 54} In any event, risk to a neighboring recreational pond (that itself is a strip mining pit) is merely one consideration. See R.C.1513.07(B)(2)(k) (determination of "probable hydrological consequences"); 1513.16(A)(10) ("[m]inimize" disturbance to hydrologic balance and water quantity). That is, the risk to such pond does not automatically require denial of a permit or implementation of a more massive test drilling program than the one chosen here. See id.
 {¶ 55} As the Fourth District has stated, it is impossible to predict with absolute certainty the future effects of mining on the hydrologic balance. Citizens Organized Against Longwalling v. Division ofReclamation, ODNR (1987), 41 Ohio App.3d 290, 297 (noting that the hydrologic determination of the operator and the Chief appeared too general, unsubstantiated and optimistic, but still upholding the Commission's determination that such determination was statutorily adequate). The Commission can weigh the risk of dewatering a pond (a risk that can be remedied) with the cost of an extensive test drilling program while considering the benefits of resource recovery to the community and the benefits of reclamation to land and area water quality. See R.C. 1513.16(A)(12)(b). As pointed out in the Commission's decision, rewatering the pond would be Oxford's responsibility if dewatering occurred. See R.C. 1513.162(A).
 {¶ 56} It may seem to the layperson that commencement of test drilling at five hundred feet from mapped deep mines with a nearby history of mismapping and inundation would be more prudent than commencement of test drilling at a mere one hundred fifty feet from the mapped mine. Nevertheless, such lay observation does not *Page 16 
in and of itself permit a reviewing court to substitute its judgment for that of the Commission.
 {¶ 57} Notably, the standard of review here does not include the unreasonable and unconscionable prongs used in the typical case applying the abuse of discretion standard. See Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219 (unreasonable, arbitrary or unconscionable). Thus, an appellate court cannot reverse a permit decision that it believes is merely unreasonable or unconscionable unless that decision can also be categorized as arbitrary or capricious or inconsistent with the law. See R.C. 1513.13(A).
 {¶ 58} Finally, we dispel appellant's misconception and quell their fear (more fully voiced in their reply brief) that the test drilling only applies to the full strip mining and not to the auger mining. As aforementioned, auger mining is specifically contained in the statutory definition of strip mining. R.C. 1513.01 (S). Moreover, the mine avoidance provision states that the operator shall refrain from "coal mining" within five hundred feet of an underground mine unless the two previously reviewed conditions are met. R.C. 1513.16(A)(12). The first condition mentions only strip mining; however, as stated above, strip mining is statutorily defined as including auger mining. Additionally, the Commission's decision states that the test drilling will begin "[a]s Oxford's mining or blasting operations are proposed to come within 500 feet of an abandoned underground mine * * *." This would apply to auger mining as well. Thus, the fact that the Commission's recitation of facts and the submitted maps differentiate between strip mining and auger mining does not mean that the test drilling mandate does not apply to auger mining as well.
 {¶ 59} In conclusion, although the Spires' concerns about their pond are understandable, we cannot substitute our judgment for that of the Commission as the Commission's decision is not arbitrary, capricious or inconsistent with law. Rather, the Commission's decision is persuasive and fully supported by the evidence.
 {¶ 60} For the foregoing reasons, the decision of the Commission is hereby affirmed.
 DeGenaro, P.J., Waite, J., concurs. *Page 1