BUCKEYE FOREST COUNCIL, INC. et al., Appellants,

v.

DIVISION OF MINERAL RESOURCES MANAGEMENT et al., Appellees.

[Cite as *Buckeye Forest Council, Inc. v. Div. of Mineral Resources Mgt.*, 172 Ohio App.3d 440, 2007-Ohio-965.]

Court of Appeals of Ohio,
Seventh District, Belmont County.

No. 05–BE–23.

Decided March 5, 2007.

442

Richard C. Sahli; Gittes & Schulte and Frederick Gittes, for appellant Buckeye Forest Council, Inc.

Britt, Campbell, Nagel & Sprout and John W. Sroat, for appellants Dysart Defenders and Chad Kister.

Mark G. Bonaventura, Holly N. Deeds Martin, and Robert A. Eubanks, Assistant Attorneys General; Linda Wilhelm Osterman, for appellee Division of Mineral Resources Management.

Porter, Wright, Morris & Arthur, L.L.P., Mark S. Stemm, and Robert J. Schmidt; Michael J. Shaheen, for appellee Ohio Valley Coal Company.

DONOFRIO, Judge.

{¶ 1} Appellants, Buckeye Forest Council, Inc., Dysart Defenders, and Chad Kister appeal an administrative decision of the Reclamation Commission ("commission"), affirming the decision of appellee, the Division of Mineral Resources Management, Ohio Department of Natural Resources ("division"), granting intervenor-appellee, the Ohio Valley Coal Company ("OVCC") a permit to mine for coal.

{¶ 2} On January 12, 1998, appellants, a nonprofit organization formed for the purpose of protecting the biological integrity of Ohio forests and habitats, filed a Lands Unsuitable Petition ("LUP") under R.C. 1513.073(A)(2)(b) requesting that an area of land in Belmont County, Ohio, be named unsuitable for coal mining.[1] R.C. 1513.073(A)(2)(b) states that an area of land can be named unsuitable for mining, if the mining could damage fragile lands that have important scientific and esthetic values and natural systems.

{¶ 3} The area of land appellants sought to be named unsuitable included the town of Bethesda, Ohio, Dysart Woods, and the surrounding area of land. Dysart Woods is owned by Ohio University and contains trees ranging from 300 to 400 years old; it is one of the last remaining old-growth forests. Appellants fear that if mining is allowed in the Dysart Woods area, the effect on the old trees will be devastating. Appellants claim that regardless of what type of mining occurs, whether it is longwall mining or room and pillar mining, the settling surface area may have an effect on the water level and the trees.

{¶ 4} OVCC, who now owns the right to mine this area of land, opposed the LUP. Under the area of land sought to be named unsuitable runs a section of the Pittsburgh No. 8 coal seam, which has an abundance of coal. OVCC claimed that it was exempt from the status of unsuitability by R.C. 1513.073(A)(5). R.C. 1513.073 exempts land that is otherwise unsuitable for mining if a coal-mining operation was already being conducted on the land on August 3, 1977, or under a permit for coal mining, or where substantial legal and financial commitments in a coal mining operation were in existence prior to January 4, 1977. R.C. 1513.073(A)(5).

---

1. A portion of the underlying facts of this case are borrowed verbatim from this court's previous decision involving this litigation in *Buckeye Forest Council v. Div. of Mineral Resources Mgt. v. Ohio Dept. of Natural Resources,* 7th Dist. No. 01 BA 18, 2002-Ohio-3010, 2002 WL 1371007.

{¶ 5} To fall under these exemptions, what was occurring on this land prior to 1977 must be considered. In the late 1960s and early 1970s, two mining systems existed in this area of land. One mining system was the Allison Mine and the other mining system was the Powhatan No. 6 Mine. Through buying, selling, and land swapping, in 1977 the western part of this area was the Allison Mine and the eastern part was Powhatan No. 6 Mine. In the 1970s, both of these mines were actively mining coal. In 1977, both mines had a coal contract with Cleveland Electric Illuminating Company ("CEI"). The actual mining that had occurred in Allison Mine was 5.7 miles from Dysart Woods. Powhatan No. 6 Mine's actual mining occurred 4.5 miles from Dysart Woods. However, the rest of the land that was not mined was dedicated to its respective mine. Through the change in the coal market over the past two decades, these mines were sold. OVCC now owns the rights to mine the Powhatan No. 6 Mine, Allison Mine, and the mine reserves for those respective mines.

{¶ 6} The Chief of the Division considered these facts and made a ruling in the May 3, 2000 letter to OVCC. The division first made a finding that Dysart Woods was unsuitable for mining. Regardless of this fact, the division stated that the Pittsburgh No. 8 coal seam was exempt from the unsuitability status. The division stated that the Pittsburgh No. 8 coal seam was a part of the original Allison Mine and Powhatan No. 6 Mine. The division found that under R.C. 1513.073(A)(5), the LUP area was exempt from the status of unsuitability due to operation prior to August 3, 1977, and the substantial legal and financial commitments ("SLFC") expended for this operation were in existence prior to January 4, 1977. Appellants appealed the decision to the commission. The commission affirmed the division's decision based on the SLFCs that were in effect on January 4, 1977. The commission declined to determine whether the division was correct in its determination that the Pittsburgh No. 8 coal seam was located on land on which coal-mining operation was being conducted on August 3, 1977. Appellants appealed the administrative decision to this court.

{¶ 7} This court affirmed the decision of the commission. *Buckeye Forest Council v. Div. of Mineral Resources Mgt., Ohio Dept. of Natural Resources,* 7th Dist. No. 01 BA 18, 2002-Ohio-3010, 2002 WL 1371007. This court made it a point to note that the decision did not grant OVCC permission to begin mining. OVCC still needed to obtain a permit in accordance with R.C. 1513.07 and 1513.071 before it could commence mining.

{¶ 8} On November 13, 2001, OVCC applied to the division for a permit for "longwall mining" and for "room and pillar mining" in the areas adjacent to Dysart Woods. Ohio Adm.Code 1501:13–4–13(C)(2)(e)(ii) requires that a minimum of one test hole be drilled every 160 acres of the application area. Given the permit area involved in this case, 16 test holes would be required. On

February 9, 1990, the division granted a "test hole waiver" to OVCC, pursuant to Ohio Adm.Code 1501:13–3–13(C)(3), which reduced the number of test holes OVCC was required to drill to 13 holes.

{¶ 9} The division granted the permit to OVCC, permitting OVCC to mine no closer than 300 to 500 feet from Dysart Woods. OVCC's proposed plan was to leave coal pillars in place to support the ground above from collapsing in. The pillars are to be much larger than the ones normally used to insure Dysart Woods are unaffected by the mining. This plan was approved by the division as part of the permit.

{¶ 10} On September 15, 2003, appellants appealed the issuance of the permit to the commission. Appellants made a motion for temporary relief on September 18, 2004 to keep longwall mining 1,500 feet from Dysart Woods. The commission denied the motion.

{¶ 11} A hearing on the issue commenced on May 11, 2004. OVCC submitted spring studies and hydrological information that addressed the impact longwall mining would have on Dysart Woods. Along with the OVCC studies and information, the commission considered hydrologic and engineering data from the previous permit OVCC held to mine areas adjacent to Dysart Woods. This data has been collected over a 30–year span.

{¶ 12} After reviewing the studies and testimony, the commission affirmed the issuance of the permit to OVCC. This appeal followed.

{¶ 13} "An appellate court reviews the decision of the Board of Commissioners under the limited standard set forth in R.C. 1513.14. *Pleasant City v. Ohio Dept. of Natl. Resources, Div. of Reclamation* (1993), 67 Ohio St.3d 312, 316, 617 N.E.2d 1103. A reviewing court will affirm the decision of the Commission unless the court determines that it is 'arbitrary, capricious or otherwise inconsistent with law.' R.C. 1513.14. If a reviewing court finds that the decision is 'arbitrary, capricious or otherwise inconsistent with law,' the decision must be vacated and remanded to the Commission for further proceedings consistent with the judgment of the reviewing court. R.C. 1513.14. The arbitrary, capricious, or inconsistent with law standard of review is a deferential one which presumes that an agency's or board's actions are valid. R.C. 1513.02 (divesting the authority to administer and enforce Chapter 1513 to the division of Mineral Resources Management); *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17, 734 N.E.2d 775; *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694." *Buckeye Forest Council,* 2002-Ohio-3010, 2002 WL 1371007, at ¶ 7.

{¶ 14} Appellants' first assignment of error states:

{¶ 15} "The commission erred because the division of mineral resources management's policy and procedure directive governing water sampling, developed in closed meetings with industry representatives, constitutes unlawful rulemaking as the policy is uniformly applied to all mining permit applications statewide and was adopted without any of the procedural safeguards required by R.C. Chapter 119."

{¶ 16} Appellants argue that the commission did not follow proper procedure when adopting Policy and Procedure Directive 2000–2 ("PPD") and, therefore, the policy is not valid. Appellants cite *Jackson Cty. Environmental Commt. v. Schregardus* (1994), 95 Ohio App.3d 527, 529, 642 N.E.2d 1142, in which the Tenth District Court of Appeals stated:

{¶ 17} "In adopting a 'rule,' an agency is required to comply with the promulgation procedure set forth in R.C. Chapter 119. See R.C. 119.02. 'Rule' is defined in R.C. 119.01(C) as: 'any rule, regulation, or standard, having a general and uniform operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency, and includes any appendix to a rule. "Rule" does not include any internal management rule of an agency unless the internal management rule affects private rights.'"

{¶ 18} Under this standard, PPD qualifies as a rule. PPD is a standard for the Division of Mineral Resources Management used to establish the standards for documenting baseline seasonal variability in the quality and quantity of surface water associated with proposed coal mining and reclamation permit application areas. The standard is uniform, as it states "[f]or each coal mining and reclamation permit application, three samples from each baseline sampling point (wells, springs, streams, etc.) must be submitted."

{¶ 19} R.C. 119.03 states:

{¶ 20} "In the adoption, amendment, or rescission of any rule, an agency shall comply with the following procedure:

{¶ 21} "(A) Reasonable public notice shall be given in the register of Ohio at least thirty days prior to the date set for a hearing, in the form the agency determines. The agency shall file copies of the public notice under division (B) of this section. (The agency gives public notice in the register of Ohio when the public notice is published in the register under that division.)"

{¶ 22} At the hearing, Mike Dillman, one of the division's geologists, admitted that there had been no public notice filed in regards to PPD. For an agency to adopt a rule, R.C. 119.03 clearly says that public notice must be given. Because public notice was not given, it would appear that the rule could not have been adopted. Therefore, the guidelines established in PPD about permit applications for coal mining are unenforceable.

{¶ 23} Accordingly, while we find merit in appellants' *argument* under this assignment of error, we find the *assignment of error* without merit because the error was not outcome-determinative in this case for the reasons discussed under appellants' second assignment of error.

{¶ 24} Appellants' second assignment of error states:

{¶ 25} "The commission unlawfully ignored the fact that the policy and procedure directive applied by the division in issuing the permit is arbitrary and capricious because the division failed to produce any scientific evidence that the water sampling policy was either valid or reliable for purposes of identifying the legally required seasonal variations (baselines) for springs and streams."

{¶ 26} Under their first assignment of error, appellants attack the PPD as an illegal rule and assert that the division's reliance on it, to whatever extent, was unlawful. Here, under appellants' second assignment of error, appellants seem to present a legally incongruous argument that instead assumes the validity of the rule. They argue that the division's issuance of the permit was unlawful and arbitrary because the division did not follow certain provisions of the PPD.

{¶ 27} Nevertheless, even though the guidelines set forth by the PPD were unenforceable, the division did not apply the guidelines when reviewing OVCC's application for a permit. Rather, the division based its decision on other information that was properly before it. OVCC submitted other, sufficient hydrologic information with the application which complied with the permitting requirements set out by the statute and rules.

{¶ 28} Appellants also argue that the division was required to determine the hydrologic "baseline" of the undeveloped springs in the old growth forest.

{¶ 29} R.C. 1513.35(A)(9) requires mine operators to "[m]inimize the disturbances of the prevailing hydrologic balance at the minesite and in associated offsite areas and to the quantity of water in surface and ground water systems both during and after coal mining operations."

{¶ 30} To that end, a mining permit application requires a report concerning the probable hydrologic consequences ("PHC") of the mining. R.C. 1513.07(B)(2)(k) requires that the permit application include a "determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, with respect to the hydrologic regime." Along with the PHC, information on the quantity and quality of water in surface and ground water systems is required. Id. Based on this and other hydrologic information, "an assessment can be made by the chief of the probable cumulative impacts of all anticipated mining in the area upon the *hydrology of the area.*" (Emphasis added.) Id.

{¶ 31} As indicated above and acknowledged by the commission, the commission decision states that "the law only requires that the permit application contain information relating to the hydrologic balance of the *area*. These provisions do not mandate establishing a baseline for each spring located on the permit or adjacent areas." (Emphasis sic.)

{¶ 32} Here, the hydrologic information submitted with the application was sufficient to ensure that the mining plan would prevent any material damage to the hydrologic balance in the area of the mine permit area and to the hydrology supporting the old-growth forest. Specifically, OVCC's permit application contained Hydrologic Measurements and Analyses in Attachment 14As for numerous water resources located above the Powhatan # 6 mine. The analyses represent years of monitoring since the Powhatan # 6 mine has operated and expanded from 1972.

{¶ 33} In addition to all those years of monitoring data, the chief, in his discretion, required that the ten undeveloped springs be monitored first monthly and then weekly by OVCC. Mike Dillman, the division's hydrologist, testified that the division began receiving monthly data on the undeveloped springs in Dysart Woods in October 2003 and began receiving weekly data on those springs in May or June 2004.

{¶ 34} Accordingly, appellants' second assignment of error is without merit.

{¶ 35} Appellants' third assignment of error states:

{¶ 36} "The commission unlawfully allowed: (1) the division to waive its own requirements for water flow sampling by ignoring explicit requirements governing such waivers, and (2) the division to ignore its legal duty to issue written findings and a formal order concerning the waiver."

{¶ 37} Appellants argue that the division did not follow proper procedure for waiving certain requirements of PPD.

{¶ 38} It is irrelevant whether proper procedure was followed in waiving requirements of the PPD. As previously discussed, the PPD was an unenforceable rule. There is no need for specific requirements of an unenforceable rule to be waived.

{¶ 39} Furthermore, the commission did not consider the PPD in coming to its decision. If the PPD was not considered in making the decision regarding the permit, whether requirements were properly waived is irrelevant because nothing regarding the PPD was considered when the decision was made.

{¶ 40} The Tenth District Court of Appeals held that in absence of a general rule, a division can make determinations on a case-by-case basis. *Dressler Coal Corp. v. Call* (1981), 4 Ohio App.3d 81, 84, 4 OBR 161, 446 N.E.2d 785. The court

went on to specify situations when a division was permitted to make a decision on a case-by-case basis, absent a general governing statute:

{¶ 41} "(1) [S]ituations that could not reasonably be foreseen; (2) problems which must be solved despite the absence of a relevant general rule; (3) insufficient experience with the particular problem to warrant rigidifying a tentative judgment into a hard and fast rule; and (4) problems so specialized and varying in nature as to be impossible to capture within the boundaries of a general rule." Id. at 85, 4 OBR 161, 446 N.E.2d 785.

{¶ 42} In *Dressler*, a division's previously adopted rules had been enjoined and the new rules had not yet been promulgated. The Tenth District permitted the division to determine standards on a case-by-case basis until new rules were adopted.

{¶ 43} Similarly, in this case, the current rule is unenforceable. A new rule has not been adopted to replace it. In the absence of an enforceable rule for determining a baseline for springs and streams, the division should be able to make determinations on a case-by-case basis, until a new rule is properly adopted.

{¶ 44} The commission did not abuse its authority in allowing the division to determine the baseline on a case-by-case basis. Here, the division required additional information (i.e., monitoring) about undeveloped springs in Dysart Woods and in the immediate vicinity of Dysart Woods, which was not required by statute, in order to determine the approval of the permit. Specifically, the division received monthly data on the undeveloped springs in Dysart Woods in October 2003 and then began receiving weekly data on those springs in May or June 2004. The division determined that this, with other reports prepared by experts, was enough information to determine a baseline for springs and streams that would be affected by the approval of the permit.

{¶ 45} Accordingly, appellants' third assignment of error is without merit.

{¶ 46} Appellants' fourth assignment of error states:

{¶ 47} "The 300/500 foot buffer zone approved by the commission to protect the old-growth Dysart Woods areas designated by the division as 'fragile lands' is arbitrary and capricious because it was based on a single 'spring study' by the intervenor which the undisputed evidence demonstrated was irrelevant, inaccurate, misleading, and unscientific."

{¶ 48} Appellants argue that the commission based its determination of the buffer zone solely on a study of springs conducted by OVCC. Appellants contend that the spring study is highly flawed and that basing a decision on the spring study would be arbitrary and capricious.

{¶ 49} Appellants' fourth assignment of error is clearly contradicted by the record. The record shows that in addition to the spring study, the commission relied on hydrological information that has been gathered by the mine since 1972.

{¶ 50} The spring study in Dysart Woods was not required by statute. Rather, it was an extra precaution taken to protect Dysart Woods. Dysart Woods is adjacent to the area covered by the permit. Ohio Adm.Code 1501:13–4–13(D)(4) states that 25 percent or at least ten developed springs from areas adjacent to the land covered by the permit must be monitored before a permit is approved.

{¶ 51} Ohio Adm.Code 1501:13–1–02(JJ) defines developed springs as those "regularly being used for domestic or agricultural purposes." There are no developed springs in Dysart Woods. There are undeveloped springs in Dysart Woods, but there is no statutory provision requiring that these be monitored.

{¶ 52} Even though it is not required, the division requested that a study be done on the effect that longwall mining would have on the undeveloped springs in Dysart Woods. This test was intended as a protection measure for Dysart Woods.

{¶ 53} OVCC had two separate studies done on the undeveloped springs in Dysart Woods. Both studies determined that the 300/500–foot buffer zone was adequate to protect the undeveloped springs. Studies done by the division confirmed OVCC's findings.

{¶ 54} Appellants argue that one study conducted was not intended to be a spring study, and relying on these results in making a decision renders the decision arbitrary and capricious. The study in question was a review of historical data from the mine since 1972. Information from the review was used to produce the spring study. Even if the spring study was not the intention of the review, this does not discredit the information provided in the study.

{¶ 55} Appellants offer no evidence that the 300/500–foot buffer zone was arbitrary and capricious. The commission did not solely rely on a spring study when coming to its decision. The commission considered historical data and other studies done by the division and by OVCC. The spring study that was considered was not required by statute, but was nevertheless conducted in order to ensure the protection of Dysart Woods. The commission was correct in determining that the 300/500–foot buffer zone was not determined in an arbitrary and capricious manner.

{¶ 56} Accordingly, appellants' fourth assignment of error is without merit.

{¶ 57} Appellants' fifth assignment of error states:

{¶ 58} "The 'test hole waiver' issued by the chief that reduced the required number of test holes to characterize the geology of the mine was unlawful as it did not include the required findings by the chief specified in his own rules."

{¶ 59} Ohio Adm.Code 1501:13–4–13 sets forth the underground mining permit application requirements for information on environmental resources. Of relevance to this assignment of error is Ohio Adm.Code 1501:13–4–13(C)(2)(e), which states:

{¶ 60} "Each application shall contain the results from test holes bored or drilled on lands above the underground workings:

{¶ 61} "(i) At a minimum of three points, not in a straight line, spaced so as to indicate the strike and dip of the coal seam;

{¶ 62} "(ii) At a minimum of one test hole per one hundred sixty acres."

{¶ 63} For the area of permit in the case at hand, approximately 15 to 16 test holes would be required.[2] Appellants argue that the division's waiver allowing OVCC to utilize only 13 test holes was not properly granted, and, thus, the grant of the permit was arbitrary and capricious.

{¶ 64} Ohio Adm.Code 1501:13–4–13(C)(3), which allows for a waiver of the (C)(2)(e) requirements, states:

{¶ 65} "Prior to submission of an application, an applicant may request that the requirements of paragraphs (C)(2)(c) to (C)(2)(e) of this rule be waived by the chief. The waiver may be granted only if the chief makes a written determination that the statement required is unnecessary because *other equivalent information is accessible to him/her in a satisfactory form.* If the chief grants a waiver, the waiver shall be submitted with the permit application." (Emphasis added.)

{¶ 66} According to appellants, the division did not make the written determination required by the statute and, therefore, the waiver is invalid.

{¶ 67} In a letter, OVCC requested a variance to utilize 13 test holes, stating that they were providing additional information that would be more informative than information provided from two to three additional test holes. The division approved the waiver in a letter, requesting additional information along with the

---

2. There are various references to how many test holes were required for the permit area. Appellants state that it would be 15.1. In their variance request, OVCC stated that it would be 15. In its decision, the commission stated that it would be 16. Whether it is 15 or 16, or somewhere in between (i.e., because it is based on a ratio of one test hole per 160 acres), the small difference is inconsequential to the resolution of appellants' assignment of error because the focus of their argument is on the variance request itself.

permit application. OVCC provided the requested information along with their permit application.

{¶ 68} The division's request of additional information along with the permit is obviously a written acceptance of equivalent, adequate information. In writing, the division approved of OVCC's intent to substitute information provided from the additional test holes for alternative research that the division deemed equivalent. Specifically, OVCC submitted 129 pages of extensive geologic information from other borings with its request. The data included at least 20 core borings—13 drilled on the application area plus an additional seven drilled in areas immediately surrounding the application area.

{¶ 69} In addition, Gregory Smith, a geologist for OVCC, testified that more borings would not provide any additional useful information because of the small area covered by the individual borings as compared to the entire application area. Likewise, Dr. Syd S. Peng, chair of the of the mining engineering department at West Virginia University, testified that although there may be slight differences from one core sample to another, these differences would be inconsequential from a rock-mechanic-stability-analysis point of view (i.e., rock strength).

{¶ 70} Therefore, the commission did not err in accepting the division's variance allowing OVCC to submit data from only 13 test holes.

{¶ 71} Accordingly, appellants' fifth assignment of error is without merit.

{¶ 72} Appellants' sixth assignment of error states:

{¶ 73} "The permit is unlawful because the application did not contain information on the roof and floor of the proposed mine required by the chief's own rules."

{¶ 74} Appellants argue that information regarding the roof and the floor of the mine was not supplied to the division, and that therefore, granting the permit was arbitrary and capricious.

{¶ 75} R.C. 1513.35(A)(1) requires the operator of an underground mine to:

{¶ 76} "Implement measures consistent with known technology in order to prevent subsidence from causing material damage to the extent technologically and economically feasible, maximize mine stability, and maintain the value and reasonably foreseeable use of such surface lands * * *."

{¶ 77} Ohio Adm.Code 1501:13-4-13(C)(2)(b) states:

{¶ 78} "The geology for all areas proposed to be affected by underground mining surface operations, those surface lands overlying coal to be mined, and the coal to be mined, shall be separately described.

{¶ 79} "Geology of all the strata to be affected by underground mining operations shall be described. The description shall include, at a minimum, the lithologic characteristics and physical and chemical properties of each stratum."

{¶ 80} Appellants contend that the one sample drilling taken by OVCC does not satisfy the requirements of the statute. However, the information from the sample does provide the minimum requirements of lithologic characteristics, and physical and chemical properties of each stratum. The commission felt that this combined with OVCC's extensive experience with mine conditions was adequate to meet the statutory requirements.

{¶ 81} Appellants also argue that borings were not taken from the area where the coal pillars are to be used, making the commission's decision arbitrary and capricious.

{¶ 82} Ohio Adm.Code 1501:13–4–13(C)(2)(d)(iv) states:

{¶ 83} "For lands within the permit and adjacent areas where the strata above the coal seam to be mined will not be removed, samples shall be collected and analyzed from test borings or drill cores to provide the following data: * * * [f]or standard room and pillar mining operations, the thickness and engineering properties of clays or soft rock such as clay shale, if any, in the stratum immediately above and below each coal seam to be mined."

{¶ 84} Because this is not a standard room-and-pillar operation, the regulation for the standard does not apply. The permit involved here is for a longwall mining operation. As the commission observed, "The development entries associated with the longwall mine *do* have pillar sections, but these are not production sections designed for maximum coal extraction. Rather, the pillars are intended to facilitate access to areas of the mine and are designed to last over the long-term. In standard room & pillar mining, production sections often are characterized by smaller pillars. Notably, the room & pillar sections of the D–360–12 have been over-designed to remain stable and to provide access and ventilation over the life of this longwall operation." (Emphasis sic.)

{¶ 85} The pillars are, in fact, more like massive blocks 65 feet by 80 feet in dimension under the development section of Dysart Woods. Dr. Peng, along with Joseph Noonan, an engineer employed by the Division, both testified about the long-term stability of the pillars within the main of the application permit area.

{¶ 86} The commission did not err in determining that the information provided was adequate to make determinations about the roof, floor, and the pillars in the mine.

{¶ 87} Accordingly, appellants' sixth assignment of error is without merit.

{¶ 88} Appellants' seventh assignment of error states:

{¶ 89} "The commission's decision was arbitrary and capricious because it was premised on forest studies submitted by the intervenor which were irrelevant, unscientific and failed to even consider obvious impacts."

{¶ 90} Dr. Runkle and Dr. Hicks both submitted reports that indicated OVCC's longwall mining would not adversely affect Dysart Woods. Appellants argue that there is no scientific basis for these reports. Therefore, because the commission relied on these reports in coming to its decision, appellants argue that the decision was arbitrary and capricious.

{¶ 91} Both sides concede that little research has been done on the effects longwall mining has on nearby forests. The studies conducted by Runkle and Hicks are some of the first.

{¶ 92} Appellants' argument is based on the opinions of its expert witness, Dr. Brian McCarthy. McCarthy admitted in his testimony that he had never studied the effects of longwall mining on forest health. Runkle and Hicks have conducted some of the only research on the subject.

{¶ 93} The commission was not arbitrary and capricious when it chose to accept the studies of Runkle and Hicks over the opinion of McCarthy in determining whether to approve OVCC's permit. Runkle and Hicks have studied the effects of longwall mining on forest health, and McCarthy had not. Additionally, as the commission observed, the experts agreed that trees and other vegetation in the forest gather their nourishment from soil moisture. Ground movement from longwall mining and any connected impact on the soil was not expected to occur above the room and pillar sections of the mine because of the horizontal and vertical distances from the longwall mining to the woods (i.e., the 300/500–foot zone). In other words, there would be no impact on soil in the forest area because no subsidence would occur above the room and pillar sections of the mine. In sum, appellants failed to establish that the mine plan would have any adverse impact on the forest health in Dysart Woods.

{¶ 94} Accordingly, appellants' seventh assignment of error is without merit.

{¶ 95} In conclusion, it is important that we reiterate our very narrow standard of review regarding the commission's decision. The commission's decision can be reversed only if it is arbitrary, capricious, or inconsistent with law. This standard of review is a deferential one, which presumes that an agency's or board's actions are valid.

{¶ 96} Given this deferential standard of review, we cannot say that the commission's decision was arbitrary, capricious, or inconsistent with law. The commission had before it 33 days of hearing testimony encompassing some 8,000 pages of transcript. Likewise, the permit application itself submitted by OVCC

contained ample data collected over a period of 30 years, which supported its approval. As the division aptly noted, OVCC went above and beyond what was required of them to obtain approval for the permit. Also, it is noteworthy that Ohio University, which owns Dysart Woods, has not pursued an appeal of the commission's decision.

{¶ 97} The decision of the commission is hereby affirmed.

Judgment accordingly.

WAITE, J., and DeGENARO, P.J., concur.