### GREENBELT ADVOCATES et al., Appellants,

v.

### DIVISION OF MINERAL RESOURCES MANAGEMENT, Appellee, et al.

[Cite as *Greenbelt Advocates v. Div. of Mineral Resources Mgt.*, 176 Ohio App.3d 638, 2008-Ohio-3238.]

Court of Appeals of Ohio,
Seventh District, Belmont County.

No. 06–BE–45.

Decided June 26, 2008.

---

**640**

Bailey, Riley, Buch & Harman, L.C. and John Preston Bailey, for appellants.

Nancy H. Rogers, Attorney General, and Mark G. Bonaventura and Molly S. Corey, Assistant Attorneys General, for appellee.

Otto A. Jack Jr., for intervenor.

DONOFRIO, Judge.

{¶ 1} Appellant, Greenbelt Advocates, appeals the decision of the Reclamation Commission ("Commission") affirming the decision of the Chief of the Division of Mines and Reclamation ("Chief") denying the Lands Unsuitable Petition ("LUP") filed by the Village of Barnesville and the Warren Township Trustees.

{¶ 2} As a preventative measure, areas of land can be designated unsuitable for coal mining because of their important environmental or social value. In Ohio, R.C. 1513.073(A) sets forth two types of lands-unsuitable designations—mandatory and discretionary. A mandatory lands-unsuitable designation is required where reclamation of the area is not technologically and economically feasible. R.C. 1513.073(A)(1). A discretionary lands-unsuitable designation is allowed in four specific situations, only three of which are relevant to this appeal. R.C. 1513.073(A)(2)(a) through (c) provide:

{¶ 3} "(2) Upon petition * * *, a surface area may be designated unsuitable for all or certain types of coal mining operations if the operations will:

{¶ 4} "(a) Be incompatible with existing state or local land use plans or programs;

{¶ 5} "(b) Affect fragile or historic lands in which the operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems;

{¶ 6} "(c) Affect renewable resource lands in which the operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, or aquifers and aquifer recharge areas."

{¶ 7} On February 3, 2004, the Village of Barnesville and the Warren Township Trustees submitted a petition to designate an area surrounding the Barnesville Village limits as unsuitable for surface mining. The petition sought a lands-unsuitable designation based on the alleged impacts to local resources (a discretionary designation), rather than an allegation relating to the feasibility of mining (a mandatory designation). Specifically, the petition was seeking to protect three local resources—land-use plans, fragile and historic lands, and water supplies.

{¶ 8} Barnesville has a population of approximately 4,200 and is located within Warren Township, in western Belmont County, Ohio. The petition area does not include property within Barnesville Village limits. Rather, Barnesville and Warren Township sought to protect an area represented by a circle extending one mile beyond Barnesville Village limits, often referred to as the Greenbelt Area.

{¶ 9} Coal mining has occurred to the north and west of Barnesville and has come within one mile of the village limits. There are five current mining sites or existing permits (permits D–573, D–680, D–877, D–676, and D–2122) and four associated adjacent sites (D–680–1, D–877–1, D–877–2, and D–676–1) within the petition area that are exempt from lands-unsuitable petitions under Ohio Adm. Code 1501:13–3–05(B)(2). Active or pending permits account for 1,366.4 acres. Four hundred and forty-nine acres are previously mined and abandoned land, 280 of which are permitted for remining. Three hundred and eighty-five acres owned by Intervenor Jeffco Resources, Inc. ("Jeffco") have also been removed from the petition area by agreement of appellants herein, Greenbelt Advocates, and Jeffco. The resulting area for which the LUP was sought totals 4,144.6 acres.

{¶ 10} Aside from coal mining and agriculture, another land usage within the petition area is water production. There are three reservoirs located within the petition area—Reservoir # 1, Reservoir # 2, and Rotary Lake. Barnesville uses Reservoir # 1 and the Slope Creek Reservoir (also referred to as Reservoir # 3), located outside the petition area, for its water production. Reservoir # 2 and Rotary Lake are considered reserve emergency water supplies. Barnesville's water-treatment plant is located next to Reservoir # 1, and water from Rotary Lake is pumped to the plant and Reservoir # 1. Barnesville produces between 0.90—1.00 million gallons of water a day, serving approximately 12,000 customers. In addition to its own village residents, Barnesville supplies water to Warren Township, the neighboring Villages of Bethesda and Quaker City, and to the Switzerland of Ohio Water District (which includes Miltonsburg, Jerusalem, Bellsville, and Wilson).

{¶ 11} Notice of receipt of the LUP was published, and the public was invited to submit comments and relevant information concerning the petition for a period of 90 days. After receiving many comments, the Division, on November 19, 2004, then sent notice to interested parties of the date, time, and location of a public hearing on the LUP. The notice included all persons with an identifiable ownership interest in the petition area, the petitioners, other persons with a known interest, and all interested local, state, and federal agencies. Notice of the hearing was also published in a local newspaper on November 24, December 1, and December 8, 2004. The hearing was held on December 15, 2004, in St. Clairsville, Ohio. Approximately 87 people attended the hearing, and 22 presented comments. On February 15, 2005, the Chief issued a decision denying the lands-unsuitable petition.

{¶ 12} On March 16, 2005, appellant, Greenbelt Advocates, a loose association of citizens interested in developing and preserving the Greenbelt Area around Barnesville (i.e., restricting strip mining) appealed the Chief's decision to the

Commission. Notably, the petitioners, the Village of Barnesville and the Warren Township Trustees, did *not* appeal the Chief's decision.

{¶ 13} Initially, Ohio Valley Coal Company (and its affiliates), Oxford Mining Company, and Jeffco, each of whom owns mineral resources in the Barnesville area, moved for and were granted intervenor status in the appeal. Later, Ohio Valley Coal Company requested and was released as an intervenor based on a stipulation that the LUP did not address the *underground* mining of coal. Jeffco also reached an agreement with the Greenbelt Advocates concerning its mineral interests in the petition area. The Greenbelt Advocates filed a motion to amend their notice of appeal to exclude Jeffco's 385 acres from the challenged area. Jeffco requested and was allowed to remain as an intervenor in the action, but in a nonparticipatory role. For unknown reasons, Oxford Mining Company requested and was allowed to withdraw as an intervenor.

{¶ 14} The appeal continued with the Greenbelt Advocates remaining as the sole participating appellant and the Division of Mineral Resources Management ("Division") as appellee. The Commission visited the petition area and subsequently held a merit hearing. Fourteen witnesses, including five experts, were examined, and approximately 1,000 pages of exhibits were submitted. The hearing lasted six days, producing 1,300 pages of transcript testimony. On August 4, 2006, the Commission affirmed the Chief's denial of the LUP in a 19–page opinion that included findings of fact and conclusions of law. This appeal followed.

## STANDARD OF REVIEW

{¶ 15} "An appellate court reviews the decision of the Board of Commissioners under the limited standard set forth in R.C. 1513.14. *Pleasant City v. Ohio Dept. of Natl. Resources, Div. of Reclamation* (1993), 67 Ohio St.3d 312, 316, 617 N.E.2d 1103. A reviewing court will affirm the decision of the Commission unless the court determines that it is 'arbitrary, capricious or otherwise inconsistent with law.' R.C. 1513.14. If a reviewing court finds that the decision is 'arbitrary, capricious or otherwise inconsistent with law,' the decision must be vacated and remanded to the Commission for further proceedings consistent with the judgment of the reviewing court. R.C. 1513.14. The arbitrary, capricious, or inconsistent with law standard of review is a deferential one which presumes that an agency's or board's actions are valid. R.C. 1513.02 (divesting the authority to administer and enforce Chapter 1513 to the division of Mineral Resources Management); *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 17, 734 N.E.2d 775; *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984), 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694." *Buckeye Forest*

*Council v. Div. of Mineral Resources Mgt., Ohio Dept. of Natural Resources,* 7th Dist. No. 01 BA 18, 2002-Ohio-3010, 2002 WL 1371007, at ¶ 7.

### LAND USE PLANS

{¶ 16} The Greenbelt Advocates have set forth seven "arguments" in their appellate brief. The arguments are, in substance, assignments of error and will be treated accordingly. Their first assignment of error states:

{¶ 17} "The Chief failed to properly consider existing land use plans."

{¶ 18} As indicated earlier, R.C. 1513.073(A)(2)(a) allows for a surface area to be designated unsuitable for coal-mining operations if the operations will be incompatible with existing state or local land-use plans or programs. In this case, the Greenbelt Advocates contend that there were land-use plans presented in the petition that demonstrated that coal mining in the Greenbelt Area is incompatible with those plans and that the Chief refused to and did not give proper consideration to those plans, based on an erroneous conclusion that they were unenforceable. Specifically, they refer to the Southeast Ohio Water Plan, the Barnesville Greenbelt Plan, and the Drinking Water Source Assessment for the Village of Barnesville. They also point to Barnesville Village Council Resolution # 2075 and a similar resolution adopted by the Warren Township Trustees.

{¶ 19} The Southeast Ohio Water Plan was prepared by the Ohio Department of Natural Resources, Division of Water, in 1978. It was prepared by that division to aid in the development of water supply and flood-control plans. The Greenbelt Advocates focus on two excerpts from that plan. Regarding the area that includes Belmont County, the plan noted that "on stream reservoir sites in this area must be selected with due regard for mine drainage pollution." Additionally, the plan notes that "reservoir sites on small drainage areas which are free of mine pollution do exist, and such sites should be carefully considered in future planning of strip mining operations in conjunction with water supply management." The Greenbelt Advocates conclude that the plan states that "surface mining should not be permitted in the watersheds of reservoir sites and potential reservoir sites."

{¶ 20} The Greenbelt Plan was prepared by the Barnesville Planning Commission in 1973. The intent of the study was "to create a better understanding of the mining situation [in the vicinity of Barnesville] and to establish a Greenbelt Plan which more fully expresses the concerns of the residents and delineates those areas that should be afforded some protection or special consideration by the mining companies." Some of those concerns included the effect of strip mining on the water supply, air quality, vegetation, and wildlife.

{¶ 21} The Greenbelt Advocates interpret the Greenbelt Plan as prohibiting surface mining within one mile of the Barnesville village limits except for those areas where mining is already permitted and abandoned mine lands.

{¶ 22} In October 1997, both the Barnesville Village Council and the Warren Township Trustees adopted resolutions formally recognizing the Greenbelt Area. The Greenbelt Advocates view these resolutions as also prohibiting surface mining in the Greenbelt Area.

{¶ 23} Lastly, the Greenbelt Advocates rely on the Drinking Water Source Assessment for the Village of Barnesville as a state land-use plan that is incompatible with mining. Concerning Reservoir # 1 (one of the two primary sources of Barnesville's water), the report recommended a protection area of 519 acres.

{¶ 24} Although the Division does not address the Greenbelt Advocates' reliance on the Drinking Water Source Assessment for the Village of Barnesville, it responds that the Southeast Ohio Water Plan preceded current mining laws and, therefore, could not have taken into consideration modern-day requirements for coal-mining operations. As for the Greenbelt Area resolutions adopted by the Barnesville Village Council and the Warren Township Trustees, the Division maintains that the resolutions have "no legal, enforceable effect on activities within the Petition Area." The Division makes a similar argument concerning the Greenbelt Plan and characterizes the plan as "aspirational."

{¶ 25} As it pertains to the purported land-use plans, the Commission's decision is not arbitrary, capricious, or otherwise inconsistent with law. Notably, none of the "plans" *prohibit* coal mining as the Greenbelt Advocates suggest. Therefore, it is difficult to conclude that any of the "plans" are necessarily *incompatible* with mining, as contemplated by R.C. 1513.073(A)(2)(a).

{¶ 26} The Greenbelt Plan was produced in 1973 and the Southeast Ohio Water Plan in 1978, well prior to the 1981 enactment of Ohio's parallel legislation to the federal Surface Mining Control and Reclamation Act ("SMCRA") codified in R.C. Chapter 1513 (Coal Surface Mining). The Greenbelt Plan identifies several concerns that Barnesville had over the effects of strip mining. However, current mining laws address each of those concerns. For example, one of the concerns was the effects of strip mining on the quality of surface water and underground water supplies. As a condition of obtaining the permit required to conduct coal surface mining operations, the operator is required to file a plan for the reclamation of the area to be affected by the operations. The reclamation plan must include a detailed description of the measures to be taken during the mining and reclamation process to ensure the protection of the quality and quantity of surface and ground water systems, both on- and off-site, from adverse effects of

the mining and reclamation process. R.C. 1513.07(C)(13)(a) and (c). See also Ohio Adm.Code 1501:13–4–05(E) and (F).

{¶ 27} The concerns identified by the Southeast Ohio Water Plan and Drinking Water Source Assessment for the Village of Barnesville are likewise addressed by current surface mining laws and regulations. In addition to the permitting requirements identified in R.C. 1513.07(C)(13)(a) and (c), cited previously, Ohio Adm.Code 1501:13–4–05 provides:

{¶ 28} "(E) Reclamation plan: protection of the hydrologic balance.

{¶ 29} "(1) Each application shall contain a plan for the protection of the hydrologic balance. The plan shall be specific to the local hydrologic conditions and shall describe the measures to be taken during and after the proposed coal mining operations in accordance with rule 1501:13–9–04 of the Administrative Code to:

{¶ 30} "(a) Minimize disturbance to the hydrologic balance within the permit and adjacent areas and to prevent material damage outside the permit area;

{¶ 31} "(b) Protect the rights of present users of surface and ground water;

{¶ 32} "(c) Avoid acid or toxic drainage;

{¶ 33} "(d) Control surface water drainage into, through, and out of the proposed permit area, pursuant to rule 1501:13–9–04 of the Administrative Code;

{¶ 34} "(e) Treat, when required under these rules, surface and ground water drainage from the area to be disturbed by the proposed activities, so as not to exceed quantitative limits on pollutants in discharges under paragraph (B) of rule 1501:13–9–04 of the Administrative Code;

{¶ 35} "(f) Restore the approximate recharge capacity of the proposed permit area in accordance with paragraph (L) of rule 1501:13–9–04 of the Administrative Code and protect or replace rights of present water users;

{¶ 36} "(g) Prevent, to the extent possible using the best technology currently available, additional contributions of suspended solids to streamflow, or runoff outside the permit area. * * *;

{¶ 37} "(h) Address any potential adverse hydrologic consequences identified in the determination of probable hydrologic consequences under paragraph (E)(2) of this rule and include preventative and remedial measures; and

{¶ 38} "(i) Meet applicable state and federal water quality laws and regulations."

{¶ 39} Lastly, nothing in the Barnesville Village Council Resolution # 2075 and a similar resolution adopted by the Warren Township Trustees prohibits coal surface mining. Resolution # 2075 states that the council determined that coal-

mining operations *could affect* the Barnesville area and desired to *restrict* coal-mining operations within one mile of the village limits. The Warren Township Trustees adopted a similar resolution supporting the establishment of the Greenbelt Area. However, the resolution also stated:

{¶ 40} "The Trustees noted for the record that they *do not oppose surface mining.* They further noted that the local economy has depended on the mining industry for many years and that many people have prospered as a result." (Emphasis added.)

{¶ 41} These resolutions cannot be viewed as being incompatible with coal-mining operations. It can be gleaned from these resolutions that the elected officials are concerned about the effects of coal surface mining on the area and desire that it be restricted. As already indicated, current coal-mining laws and regulations address those concerns and act as a "restriction" on coal-mining operations in the area.

{¶ 42} Accordingly, the Greenbelt Advocates' first assignment of error is without merit.

## RESERVOIRS

{¶ 43} The Greenbelt Advocates' second assignment of error states:

{¶ 44} "The Chief's decision is arbitrary and capricious in that it fails to protect the Barnesville reservoirs."

{¶ 45} As mentioned earlier, R.C. 1513.073(A)(2)(c) allows for a surface area to be designated unsuitable for coal-mining operations if the operations will "[a]ffect renewable resource lands in which the operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, or aquifers and aquifer recharge areas." In this case, there are three reservoirs located within the petition area—Reservoir # 1, Reservoir # 2, and Rotary Lake. Barnesville uses Reservoir # 1 and the Slope Creek Reservoir (also referred to as Reservoir # 3), located outside the petition area, for its water production. Reservoir # 2 and Rotary Lake are considered reserve emergency water supplies.

{¶ 46} The Greenbelt Advocates emphasize that Barnesville's reservoirs are a renewable resource for which there is no substitute if they are lost or degraded. They also contend that contemporary mining methods cannot adequately protect the quality of the reservoirs. More specifically, they are concerned about an increase in sediment, nonpoint pollutants, and acid mine discharge affecting the water supply. They assert that Barnesville's treatment plant would not be able to handle the increase of these materials absent substantial upgrades.

{¶ 47} As evidence in support of their arguments, the Greenbelt Advocates point to the testimony of Dr. Julie Weatherington–Rice. The Commission accepted her as an expert witness in the areas of geology, hydrogeology, soil sciences, and protection of water resources. She testified to an inconsistency between Ohio surface mining law and state/federal watershed initiatives, essentially suggesting that the standards under the former have not kept pace with those developed under the latter. She also explained how, in her opinion, "permitting surface mining in the watersheds currently in use and the future watersheds endanger the water supply for Barnesville and the region." She explained that undisturbed rock and coal in the ground hold onto metals. Once the ground is broken, rainwater can carry those metals from the watersheds into the reservoirs, where the Barnesville water-treatment plant would be unable to treat the water without expensive upgrades.

{¶ 48} The Greenbelt Advocates also point to the testimony of Bill Knox. Knox is a self-employed CPA and also works for Barnesville, providing assistance with community and economic development issues and projects—in particular, with Barnesville's water-distribution system. They highlight his testimony in which he describes Barnesville's water-treatment plant:

{¶ 49} "Q. How is your treatment currently done?

{¶ 50} "A. We built a new plant in 2002. We use a multi-barrier filtration system. Barnesville was the second community in the state of Ohio that the Ohio EPA permitted to use this alternative technology. It requires a very high quality of surface water, and we actually did an 18–month OEPA pilot study before the OEPA would actually permit that. Our engineering firm in conjunction with the Ohio EPA did a pilot study to allow us, then, to construct this type of plant.

{¶ 51} "Originally, our first projections on the cost of the new water treatment facility was around seven to about seven and half million dollars. Using the alternative technology, it brought it down to 3.8 million. So it was a tremendous savings to the Village to be able to do it that way."

{¶ 52} Next, the Greenbelt Advocates refer to a letter from Michael G. Baker, Chief of the Division of Drinking and Ground Waters of the Ohio Environmental Protection Agency ("OEPA"), to R. Scott Steitler of the Division. Baker comments on the Barnesville LUP and states:

{¶ 53} "As you will note in the attached report, a portion of the area referenced in the petition includes the drinking water source protection areas for the Village of Barnesville's public water system. We are encouraging local officials to implement protective strategies within these protection areas to ensure a safe, long term and reliable source of drinking water. Surface mining in these watersheds could dramatically alter the quality and quantity of [the] Village's

source of drinking water. Ground water availability in the vicinity is insufficient to supply the needs of the Village."

{¶ 54} In response, the Division maintains that Ohio's existing coal-mining laws address the Greenbelt Advocates' concerns. For example, the Division states that the law requires the construction of sediment control structures.

{¶ 55} In this instance, the Commission's decision is not arbitrary, capricious, or otherwise inconsistent with law. As the Commission aptly observed, first and most importantly, there does not appear to be any *minable* coal in the area of the existing reservoirs. This was supported by the expert testimony of Tom Hines.

{¶ 56} Also, if coal mining was ultimately conducted within the petition area after the permitting process, the Division presented evidence that the natural makeup of the subsurface could alone handle any acid created by the release of the metals.

{¶ 57} Next, the Commission's decision adequately addresses the Greenbelt Advocates' concerns relating to rainfall run-off. Ohio Adm.Code 1501:13–3–07(A)(2) requires that LUPs be reviewed under the assumption that contemporary mining practices required by the rules would be followed if the area were to be mined.

{¶ 58} Before a mining permit can be issued, an applicant must demonstrate that mining will be conducted in such a way as to minimize disturbance to the hydrologic balance in and around the potential permit area. As the Commission helpfully explained:

{¶ 59} "In fact, the permitting process requires both the applicant and the Division to project and evaluate any potential affects [sic] on the hydrologic balance in the area of the proposed mine. O.R.C. § 1513.07(C)(13)(a) & (c) requires an applicant to submit a detailed description of the measures to be taken during the mining and reclamation process to ensure the protection of the quality and quantity of surface and ground water systems both on and off site. Numerous safeguards are incorporated into the application and mining process, including the construction of sediment impoundments, groundwater and surface water monitoring plans, the imposition of effluent limitations and the use of buffer zones surrounding streams. Notably, the permitting system also allows for the inclusion of Ohio EPA and Army Corps of Engineers restrictions as part of the permit approval process. Once permitted, any mining activity must also be conducted consistent with contemporary mining practices. The law requires that mining and reclamation proceed in a manner that protects water resources. Periodic inspections of mine sites by Division inspectors helps to ensure that mining and reclamation will be conducted in accordance with these important requirements of law."

{¶ 60} Lastly and more specifically, Ohio's existing mining and reclamation laws address the Greenbelt Advocates' concerns of increased run-off and resulting sedimentation within the petition area. The laws require the construction of sediment control structures, such as sediment ponds. R.C. 1513.02(A)(1)(b); Ohio Adm.Code 1501:13–4–04(J)(14)(a); Ohio Adm.Code 1501:13–4–05(E)(1)(g).

{¶ 61} Accordingly, the Greenbelt Advocates' second assignment of error is without merit.

## POTENTIAL RESERVOIRS

{¶ 62} The Greenbelt Advocates' third assignment of error states:

{¶ 63} "The Chief's decision not to protect the areas surrounding the reservoirs and the potential reservoir areas was also arbitrary and capricious."

{¶ 64} For the same reasons advanced under the second assignment of error concerning the existing reservoirs, the Greenbelt Advocates argue that potential reservoir sites should be protected, especially the area northwest of the existing watersheds. Those areas include Reservoir # 2 and Rotary Lake, which are considered Barnesville's emergency water supplies.

{¶ 65} Again, they rely on the testimony of Dr. Julie Weatherington–Rice. She explained that bedrock in Ohio dips to the southeast, causing rainfall to flow in that direction. She explained that mining in one watershed has a direct impact on an adjacent watershed. Specifically, she stated that it affects the "groundwater to surface water recharge process," potentially causing a degradation in water quality as it flows from the mined watershed to the adjacent one.

{¶ 66} The Division argues that lands-unsuitable designations were designed to protect only existing resources, not theoretical, undeveloped water supplies.

{¶ 67} R.C. 1513.073 sets forth the overall parameters for consideration of an LUP. R.C. 1513.073(A)(2)(a) through (c) provides:

{¶ 68} "(2) Upon petition * * *, a surface area may be designated unsuitable for all or certain types of coal mining operations if the operations *will*:

{¶ 69} "(a) Be incompatible with *existing* state or local land use plans or programs;

{¶ 70} " * * *

{¶ 71} "(c) Affect *renewable* resource lands in which the operations could result in a substantial loss or reduction of long-range productivity of water supply or of food or fiber products, or aquifers and aquifer recharge areas." (Emphasis added.)

{¶ 72} As can be seen, the statute focuses on existing plans and renewable water resources. It does not mention "potential" or "future" water resources. Consequently, the lands-unsuitable petition process is not intended for the protection of theoretical or undeveloped water supplies. Additionally, the water supplies referred to are not necessary for Barnesville's water supply. Rather, they are secondary resources that are being considered as assisting in the expansion of Barnesville's water business to reach new customers outside Barnesville itself.

{¶ 73} Accordingly, the Greenbelt Advocates' third assignment of error is without merit.

## HISTORIC DISTRICT

{¶ 74} The Greenbelt Advocates' fourth assignment of error states:

{¶ 75} "Blasting threatens the Barnesville Historic District."

{¶ 76} As mentioned earlier, R.C. 1513.073(A)(2)(b) allows for a surface area to be designated unsuitable for coal-mining operations if the operations will "[a]ffect fragile or historic lands in which the operations could result in significant damage to important historic, cultural, scientific, and esthetic values and natural systems."

{¶ 77} There appears to be no dispute that the Barnesville area has numerous historic structures. The Greenbelt Advocates argue that blasting will damage those structures. In support, they point to the testimony of a local homeowner and a letter from a preservation specialist.

{¶ 78} At the hearing before the Commission, the Greenbelt Advocates called Jeff Thatcher to testify. He lives in Barnesville and is a self-employed home-remodeling contractor. He claimed that blasting related to permit D–2122 (in the area southwest of his home) caused cracks in the new block foundation of his home and to plaster walls in every room of the home. He measured the cracks with pencil marks. His conclusion was based on the correlation of those marks to mining-related blasting in the area.

{¶ 79} Next, the Greenbelt Advocates cite an attachment that was made to the LUP. It is a letter from David R. Mertz, the Program Coordinator for the Building Preservation Technology program at the Belmont Technical College. It is addressed to the Chief of the Division of Mines and Reclamation. Dated 1989, it states in part:

{¶ 80} "Blasting has a direct effect on the structural integrity of nearby buildings. Especially vulnerable are masonry and stone buildings where the shock of the blast breaks the mechanical and chemical bonds between the mortar

and building material. Since most of these structures are compressive in nature, this joint separation is barely visible and has no immediate affect on the structural stability. The real damage occurs years later after the separated joint has allowed moisture penetration into the joint cavity. Continuous freeze-thaw cycles spawl the mortar out of the joints. The presence of trapped water also causes masonry to spawl, wood to rot, iron components to rust, attracts insects, and provides a haven for moss and other damaging vegetation to grow.

{¶ 81} " * * *

{¶ 82} "Another negative effect of blasting is structural shifts and resettlement. Roof flashings become disengaged allowing water penetration into roof cavities. Foundations become cracked allowing basement flooding. Doors and windows are jarred out of alignment because of resettlement. Utility and sewage/septic lines are also at risk during blasting operations."

{¶ 83} In response, the Division points to the testimony of its blasting expert, Michael J. Mann. The Division cites Mann's 20 years of experience in blasting operations conducted by coal-mining companies. He testified extensively about how Ohio's existing coal-mining laws provide safeguards and protections to structures near blast sites. Specifically, he testified to the safeguards implemented by Oxford Mining Company at its sites within the petition area and near Barnesville.

{¶ 84} With regard to Barnesville's historic structures, the Commission's decision is not arbitrary, capricious, or otherwise inconsistent with law. As with the concern over Barnesville's water supply, it bears repeating here that any application for future mining within the petition area would have to meet the permitting requirements of R.C. Chapter 1513. Ohio Adm.Code 1501:13–4–04(A)(2) requires:

{¶ 85} "(a) Each application shall describe and identify the nature of cultural, historic and archeological resources listed or eligible for listing on the 'National Register of Historic Places' and known archeological sites within the proposed permit and adjacent areas. The description shall be based on all available information, including, but not limited to, information from the state historic preservation officer and from local archeological, historical, and cultural preservation agencies.

{¶ 86} "(b) The chief may require the applicant to identify and evaluate important historic and archeological resources that may be eligible for listing on the 'National Register of Historic Places,' through:

{¶ 87} "(i) Collection of additional information;

{¶ 88} "(ii) Conduct of field investigations; or

{¶ 89} "(iii) Other appropriate analyses."

{¶ 90} Likewise, any permitted mining would have to be conducted consistently with Ohio's blasting laws. R.C. 1513.161 and Ohio Adm.Code 1501:13–9–06(A) set forth stringent rules and regulations on blasting, designed to ensure safety and protect property from damage. For example, under R.C. 1513.161(C)(2), the Chief is required to promulgate rules to prevent damage to public and private property outside the permit area. See also Ohio Adm.Code 1501:13–9–06(F)(1).

{¶ 91} Lastly, the evidence presented in this regard by the Greenbelt Advocates seems questionable. Thatcher's claim concerning the alleged damage to his home by blasting was formally denied by the Division. Unlike Mann, he was not qualified as an expert. The damage to his home could just as reasonably be attributed to the age of the home, substandard construction of the new foundation, or sediment load issues. As for the Mertz letter, it spoke in generalities and did not appear to account for existing laws and regulations. The letter was drafted 15 years before the present LUP was submitted. It is not clear whether Mertz is a blasting expert, and he was never called to testify as one.

{¶ 92} Accordingly, the Greenbelt Advocates' fourth assignment of error is without merit.

## PUBLIC HEARING NOTICE

{¶ 93} The Greenbelt Advocates' fifth assignment of error states:

{¶ 94} "The Division provided improper notice of the public hearing."

{¶ 95} The Chief is required to develop "[p]rocedures for proper notice and opportunities for public participation, including a public meeting prior to making any designation or redesignation" pursuant to the lands-unsuitable petition law. R.C. 1513.073(A)(3)(c). These procedures for reviewing a lands-unsuitable petition are set forth in Ohio Adm.Code 1501:13–3–07. The Chief is required to hold a public hearing in the locality of the area covered by the petition. Ohio Adm.Code 1501:13–3–07(C)(1)(a). "Notice of the hearing shall be sent by certified mail and postmarked not less than thirty days before the scheduled date of the hearing." Ohio Adm.Code 1501:13–3–07(C)(3).

{¶ 96} Additionally, Ohio Adm.Code 1501:13–3–07(C)(4) states:

{¶ 97} "The chief shall notify the general public of the date, time, and location of the hearing by placing a newspaper advertisement once a week for two consecutive weeks and once during the week prior to the hearing in the locale of the area covered by the petition. The advertisement shall begin between four to five weeks before the scheduled date of the public hearing."

{¶ 98} In this case, it is undisputed that the December 15, 2004 public hearing was held only 26 days after notice of the hearing was sent by certified mail to interested parties, not the 30 days stated in the regulations. It is also undisputed that publication of the hearing began only three weeks before the public hearing, not the four to five weeks stated in the regulations.

{¶ 99} The Division's acknowledged failure to comply with the time frames set forth in the regulations for notice of the public hearing did not have a negative impact on public participation concerning this particular LUP. R.C. 1513.073(A)(3)(c) states that the Chief shall develop "[p]rocedures for *proper notice* and *opportunities for public participation,* including a public meeting prior to making any designation or redesignation." (Emphasis added.) Here, it is apparent that the interested parties were given "proper notice" and "opportunities for public participation."

{¶ 100} The Division sent letters informing approximately 400 people or entities that the LUP had been filed. As the Division points out, the Greenbelt Advocates have not alleged that they themselves were prejudiced by the 26–day notice as opposed to a 30–day notice. The Greenbelt Advocates did, in fact, receive notice of the hearing and were represented at the hearing and presented their position on the LUP.

{¶ 101} Concerning publication of the hearing, it is evident that the Division was cognizant of and sympathetic to giving interested parties and the public an opportunity for participation. To that end, the Division presented the testimony of Scott Stitler. He is an environmental specialist with the Division. He was assigned to the Barnesville LUP and reviewed it for administrative completeness. Concerning the publication of the public-hearing date, he testified that due to regulatory time constraints, the hearing would have been required to be held by December 30, 2004. Since that date fell between two holidays, a time when some people likely would have been out of town, they opted for a slightly earlier date to ensure that the most people could attend.

{¶ 102} Consequently, the Division took the necessary steps to ensure proper notice and opportunities for public participation. In addition to the public hearing itself, a comment period was held open for two weeks following the hearing. Notably, the Greenbelt Advocates have not cited one case in which technical noncompliance with the aforementioned regulations could be the basis for reversing the Chief's decision.

{¶ 103} Accordingly, the Greenbelts Advocates' fifth assignment of error is without merit.

## BURDEN OF PERSUASION

{¶ 104} The Greenbelt Advocates' sixth assignment of error states:

{¶ 105} "The Chief improperly placed the burden of persuasion on the petitioners."

{¶ 106} Ohio Adm.Code 1501:13–3–07(C)(1)(d), which addresses the form of the public hearing itself, dictates that "[n]o person shall bear the burden of proof or persuasion."

{¶ 107} The Greenbelt Advocates argue that a review of the Chief's decision reveals that he improperly placed the burden of persuasion on the petitioners. They highlight several instances, as follows:

{¶ 108} "The Petition does not demonstrate that any land use policies/programs of the state or local government preclude surface mining operation * * * " (Chief's Decision, p. 9, ¶ 3.)

{¶ 109} "Neither is there any evidence provided in the Petition to suggest that previous, or current mining * * * " (Chief's Decision, p. 10, ¶ 2.)

{¶ 110} "There is no evidence to support this assertion." (Chief's Decision, p. 11, ¶ 3.)

{¶ 111} "The Petitioners have not quantified this value * * * " (Chief's Decision, p. 11, ¶ 4.)

{¶ 112} "The Petition does not demonstrate * * * " (Chief's Decision, p. 12, ¶ 1.)

{¶ 113} "The Petition fails to support the allegation * * * " (Chief's Decision, p. 12, ¶ 1.)

{¶ 114} "There was no substantive evidence provided * * * " (Chief's Decision, p. 15, top of page.)

{¶ 115} The Greenbelt Advocates' argument here is nothing more than a failed attempt to use semantics to create the illusion that the Chief placed on the petitioners below the burden of proof or persuasion. R.C. 1513.073(B) states in part that the "petition shall contain allegations of facts with supporting evidence that would tend to establish the allegations." To a large extent, the Greenbelt Advocates confuse the concepts of burden of proof or persuasion and the burden of production. R.C. 1513.073(B) places on the petitioner the burden of production; that is, to produce supporting evidence that would tend to establish the factual allegations contained within the petition. The excerpts from the Chief's decision cited by the Greenbelt Advocates are largely reflective of that. In none of those excerpts did the Chief say, "The Petitioners have failed to prove or persuade."

{¶ 116} Accordingly, the Greenbelt Advocates' sixth assignment of error is without merit.

## FAIR CONSIDERATION

{¶ 117} The Greenbelt Advocates' seventh assignment of error states:

{¶ 118} "It is apparent that the Lands Unsuitable Petition was not given fair consideration."

{¶ 119} The Greenbelt Advocates allege that the Division's review of the LUP was tainted by a fear of a takings claim. They cite the Office of Surface Mining Reclamation and Enforcement Annual Evaluation Summary Report for the 2005 Evaluation Period, in which the Division reported that " 'Ohio settled a takings claim based on a past designation that an area was unsuitable for coal mining. However, the settlement cost Ohio several million dollars. Ohio acknowledges one result of the 2002 Ohio Supreme Court's ruling in this case and the potential cost of future takings claims is that they may be unable to continue to implement SMCRA's lands unsuitable provisions.' " The Greenbelt Advocates do not specify where, in this voluminous record, this report is located, and it does not appear that it is contained in the record on appeal. Moreover, since the report evaluates the year 2005, it seems highly unlikely that this report could have somehow "tainted" the Division or the Chief's judgment, since the Chief issued his decision near the beginning of 2005, on February 12.

{¶ 120} Nevertheless, the Greenbelt Advocates also cite *State ex rel. R.T.G., Inc. v. State*, 98 Ohio St.3d 1, 2002-Ohio-6716, 780 N.E.2d 998. This is presumably the case referred to in the aforementioned 2005 report. RTG was a coal-mining company that purchased land in eastern Ohio. After purchasing the land and obtaining a conditional-use permit, RTG began surface mining the land to extract the coal. However, subsequently, the Ohio Reclamation Board of Review designated some of the land as "unsuitable for mining," much of which was RTG coal-mining land. The court held that a compensable taking had occurred because RTG had purchased the land for a specific purpose, received permission to conduct that conditional use (coal mining), and then later its "vested rights" were frustrated by a subsequent regulatory action.

{¶ 121} Here, it is not clear whether *R.T.G., Inc.* would support a finding that there has been or might be a compensable taking. That is not the issue presented by this appeal. None of the coal companies who own land within the petition area are a party to this appeal. The issue presented by this appeal is whether the Commission's decision affirming the Chief's decision denying the LUP was arbitrary, capricious, or otherwise inconsistent with law. As the

Commission aptly observed, neither it nor the Chief have the authority to pass upon a constitutional takings claim.

{¶ 122} Accordingly, the Greenbelt Advocates' seventh assignment of error is without merit.

{¶ 123} In conclusion, it is important to note this court's very narrow standard of review regarding the Commission's decision. The Commission's decision can be reversed only if it is arbitrary, capricious, or inconsistent with law. This standard of review is a deferential one that presumes that an agency's or board's actions are valid. The hearing conducted before the Commission was a thorough one. Fourteen witnesses, including five experts, were examined, and approximately 1,000 pages of exhibits were submitted. The hearing lasted six days, producing 1,300 pages of transcript testimony.

{¶ 124} Given this deferential standard of review, it cannot be said that the Commission's decision was arbitrary, capricious, or inconsistent with law. Even though we affirm the Commission's decision, it is important to remember that doing so would not per se authorize mining within the petition area. In order for mining to occur in this area, the mining company operators must seek and be granted a permit under R.C. 1513.07 and 1513.071. As indicated, under these statutes numerous considerations are examined, including the hydrologic consequences and objections from parties who have an interest and who would be adversely affected by the granting of the permit. Accordingly, it is likely that the matter may be back before this court in the event that such a permit is requested and either granted or denied. See, e.g., *Buckeye Forest Council v. Div. of Mineral Resources Mgt., Ohio Dept. of Natural Resources,* 7th Dist. No. 01 BA 18, 2002-Ohio-3010, 2002 WL 1371007, and *Buckeye Forest Council, Inc. v. Div. of Mineral Resources Mgt.,* 172 Ohio App.3d 440, 2007-Ohio-965, 875 N.E.2d 631.

{¶ 125} The Commission's decision is hereby affirmed.

Decision affirmed.

DEGENARO, P.J., and WAITE, J., concur.